Mary Ellen KIMBLE,
Plaintiff-Respondent,

v.

The WORTH COUNTY R–III BOARD
OF EDUCATION,
Defendant-Appellant.

No. WD 34022.

Missouri Court of Appeals,
Western District.

March 20, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
May 1, 1984.

Application to Transfer Denied
June 19, 1984.

Martin D. Prins, Independence, John C. Andrews, Grant City, Norman Humphrey, Jr., Independence, for defendant-appellant.

Jerold L. Drake, Stephens & Drake, Grant City, for plaintiff-respondent.

Before SOMERVILLE, P.J., and NUGENT and LOWENSTEIN, JJ.

SOMERVILLE, Presiding Judge.

Following a public hearing pursuant to § 168.118, RSMo 1978, Mary Ellen Kimble, a "permanent teacher", was found by The Worth County R–III Board of Education to have engaged in "immoral conduct" (§ 168.114.1(2), RSMo 1978), and her indefinite contract was terminated. An appeal was taken to the Circuit Court of Worth County which reversed the decision of The Worth County R–III Board of Education (hereinafter Board) and ordered that Mary Ellen Kimble (hereinafter Kimble) be reinstated, returned to permanent teacher status, and entitled to compensation for the period suspended from work.

The matter reaches this court on an appeal by the Board from the judgment entered by the Circuit Court of Worth County. The circuit court reversed the decision of the Board on the grounds that it "was arbitrary, capricious and unreasonable", constituted "an abuse of discretion", and "was unsupported by competent and substantial evidence upon the whole record." The circuit court further held "that there was not competent and substantial evidence upon the whole record ... that the alleged 'immoral conduct' rendered the teacher unfit to teach or that the teacher's teaching ability was adversely affected in any way." Parenthetically, the judgment of the circuit court evaporates insofar as having any bearing on judicial review at the appellate level due to strictures imposed thereon in contested administrative cases, infra.

Section 168.120(2), RSMo 1978, provides that an appeal from the decision of the Board shall be governed by the provisions of Chapter 536. In terms of administrative review this was a contested case (§ 536.-010(2), RSMo 1978) and therefore the scope of review for both this court and the circuit court is statutorily prescribed by § 536.140, RSMo 1978.[1]

 Review of contested administrative cases has been judicially addressed on numerous occasions. Reference is made to the following cases in the context of the instant appeal. Neither the circuit court nor this court reviews the decision of the Board de novo. *Michler v. Krey Packing Co.*, 363 Mo. 707, 253 S.W.2d 136, 141 (banc 1952). This court does not review the decision of the circuit court; to the contrary, each reviews the decision of the Board. *Edmonds v. McNeal*, 596 S.W.2d 403, 407 (Mo. banc 1980). Although all evidence before the Board is considered on judicial review, both the circuit court and this court are precluded from substituting their judg-

---

1. Section 536.140, RSMo 1978, insofar as here pertinent, reads as follows:

    "1. The court shall hear the case without a jury and, except as otherwise provided in subsection 4, shall hear it upon the petition and record filed as aforesaid.

    2. The inquiry may extend to a determination of whether the action of the agency

    (1) Is in violation of constitutional provisions;

    (2) Is in excess of the statutory authority or jurisdiction of the agency;

    (3) Is unsupported by competent and substantial evidence upon the whole record;

    (4) Is for any other reason, unauthorized by law;

    (5) Is made upon unlawful procedure or without a fair trial;

    (6) Is arbitrary, capricious or unreasonable;

    (7) Involves an abuse of discretion...."

ment on the evidence and neither may set aside the Board's decision unless it is unsupported by competent and substantial evidence on the whole record or is otherwise invalid. *Harrod v. Board of Education,* 500 S.W.2d 1, 6 (Mo.App.1973). The evidence must be considered in the light most favorable to the Board's decision, together with all reasonable inferences which support it. Id. Determination of the credibility of witnesses is a function of the Board and entitled to deference on judicial review. *Merideth v. Board of Education,* 513 S.W.2d 740, 745 (Mo.App.1974). If evidence before the Board warranted either of two decisions, the Board's decision is binding on judicial review, and it is irrelevant that there may be supportive evidence of an opposing view. *Hanebrink v. Parker,* 506 S.W.2d 455, 458 (Mo.App.1974). Inclusion within the scope of judicial review of contested cases that the administrative decision must be supported by competent and substantial evidence on the whole record (§ 536.140.2(3), RSMo 1978), is rooted in Art. V, § 18, Constitution of Missouri (as amended 1976). By reason of its constitutional heritage, determination of whether an administrative decision in a contested case is supported by competent and substantial evidence on the whole record is of magnum importance.

The Board relies on one point on appeal, namely, its decision was supported by competent and substantial evidence on the whole record when reviewed in accordance with attendant judicial guidelines addressing the scope of judicial review. Kimble counters the Board's position on a variety of grounds. One, the Board's decision was not supported by competent and substantial evidence on the whole record. Two, "immoral conduct" as prescribed by § 168.-114.1(2), supra, is unconstitutionally vague in violation of Amendments V and XIV of the Constitution of the United States and Art. I, § 10, of the Constitution of Missouri; moreover, the incidents relied on, in any event, did not constitute "immoral conduct". Three, the purported instances of "immoral conduct" did not render her unfit to teach. Four, the doctrine of laches barred two of the three incidents found by the Board to constitute "immoral conduct." All of the aforementioned grounds were raised by Kimble before the Board and reasserted in her petition for review in the circuit court.

■ The charge levelled against Kimble which culminated in termination of her indefinite contract by the Board was predicated upon three instances of alleged "immoral conduct" within the ambit of § 168.-114.1(2), supra. The three incidents constituting "immoral conduct", supra, were as follows: that during the 1973–74 school year a teapot which was a prop in a school play was returned by Kimble after word was disseminated that it was missing; that during the 1976–77 school year she took $20 from gate receipts collected at a basketball game, although she refunded the money after being confronted about the matter; and that in February, 1982 she took a set of books belonging to the school district, indicated that they had never been received from the vendor when confronted about them, and then subsequently returned them to the school library. It is appropriate to note at this juncture that in a pedagogic context, Kimble served as teacher-librarian.

The Board made detailed findings of fact substantiating all three incidents set forth in the charge as constituting "immoral conduct", and, additionally, that her conduct with respect thereto "required extra precautionary measures to supervise her", "had a negative effect on the student relationship and teacher relationship existing in The Worth County R–III School District", and that continuance of her employment "creates additional administrative and supervisory burdens as well as distrust among the staff and faculty and has an adverse and detrimental effect on the students, faculty and the educational process of The Worth County R–III School District."

As frequently occurs in contested cases, a close perusal of the instant record in toto reveals its share of contradictory evidence, conflicting inferences, and divergent theories. Be that as it may, when the whole record is considered in light of the attendant principles governing the scope of judicial review of contested administrative cases, the conclusion is inescapable that the findings and decision of the Board were supported by competent and substantial evidence on the whole record and do not reflect that the Board abused its discretion or acted in an arbitrary, capricious or unreasonable manner. Any natural impulse for reviewing courts to substitute their judgment on the evidence for that of the administrative tribunal in contested cases has a momentum of its own which must be held in check.

■ Attention now focuses on whether the Board's decision was otherwise invalid by reason of any of the other infirmities attributed to it by Kimble. Her contention that the statutory basis (§ 168.114.1(2), supra) upon which the Board's decision necessarily rested was "unconstitutionally vague", thereby rendering it invalid, is laid to rest in *Ross v. Robb*, 662 S.W.2d 257, 259 (Mo. banc 1983):

"In *Thompson v. Southwest School District et al.*, 483 F.Supp. 1170 (W.D. Mo.1980), the plaintiff, a teacher dismissed from service for engaging in 'immoral conduct,' alleged that section 168.-114.1(2), RSMo 1978, was impermissibly vague and denied her due process of law. The court agreed that, in the abstract, the phrase 'immoral conduct' was constitutionally suspect under the strict standards of construction to be employed in criminal and first amendment contexts. *Id.* at 1179. The court went on to say, however, that the phrase was part of a statutory scheme; that, construed with the other subsections of the statute, the phrase is 'capable of being given a more precise judicial construction so as to avoid the vagueness issue.' *Id.* at 1180.

The court concluded that *immoral conduct relates to conduct rendering a teacher unfit for the performance of his duties. Id.* More precisely, the court found that immoral conduct means '*conduct rendering plaintiff unfit to teach.*' *Id.* at 1181. This analysis persuades denial of Ross's constitutional challenge." (emphasis added)

■ The foregoing logically brings this court to Kimble's bifurcated argument that the incidents relied on did not constitute "immoral conduct", and, even if subject to being so construed, failed to render her unfit to teach. This argument is soundly refuted by competent and substantial evidence permeating the whole record supporting both the conduct alleged and the fact that such rendered her unfit to teach, thus meeting the test of "immoral conduct" set forth in *Ross v. Robb*, supra. The taking of property belonging to another without consent, notwithstanding its return when confronted with such wrongdoing, breaches even the most relaxed standards of acceptable human behavior, particularly so with regard to those who occupy positions which bring them in close, daily contact with young persons of an impressionable age. It is eminently proper to note that Kimble, in addition to her duties as librarian, taught "library" and "reference" skills at the elementary level on a regular basis, and on an incidental basis at the high school level.

Failure to invoke separate charges when each of the first two incidents occurred does not unequivocally suggest they were considered de minimis or condoned, and any attempt to do so places them in a false perspective. All three incidents were relied on to show a continuing pattern of behavior which crested when the final incident occurred in February of 1982 immediately following which charges were lodged resulting in termination of Kimble's indefinite contract. Any argument that reliance upon the first two incidents was indicative of an arbitrary, capricious and unreason-

able attitude on the part of the Board is negated when all the incidents are collectively viewed as evidencing a pattern of continuing behavior.

Kimble's final contention, that the first two incidents relied upon should have been barred by the doctrine of laches, and failure to so treat them tainted the Board's decision with incurable prejudice, is unpersuasive. Admittedly, the first of said incidents occurred during the 1973–74 school year and the second occurred during the 1976–77 school year.

■■■ Assuming, arguendo, that the doctrine of laches is applicable in contested cases before administrative tribunals, reference is had to its salient principles. There is no fixed period within which a right or claim must be asserted in order that it avoid being barred by laches; temporal limits are drawn in light of the circumstances of the particular case; mere delay, in and of itself, does not constitute laches; laches is a question of fact to be determined from all the evidence and circumstances adduced at trial; laches cannot be invoked to thwart right or justice, but only to defeat resultant prejudice, if not invoked, to one asserting it; and he who asserts laches carries the burden of proof. *Metropolitan St. Louis Sewer District v. Zykan*, 495 S.W.2d 643, 656–57 (Mo.1973).

■■■ Prejudice which supports laches generally falls into one or the other of two categories, i.e., (1) loss of evidence which would support the position of one seeking to invoke laches with regard to the claim he is called upon to defend against, and (2) a change of position by one seeking to invoke laches in a way that would not have occurred but for the delay. *Rich v. Class*, 643 S.W.2d 872, 877 (Mo.App.1982).

Kimble does not claim that she was prejudiced by a change of position on her part due to delay in filing charges against her regarding the first two incidents. In terms of prejudice in its broadest sense, any delay is susceptible of the inference that the

Board did not precipitously file separate charges on each of the first two incidents, but out of deference to Kimble abstained from doing so until a continuing pattern of behavior was evinced.

■■■ Kimble raises her claim of prejudice in an evidential context. Prejudice in an evidential frame of reference contemplates a loss of demonstrative evidence or the unavailability of witnesses which or who could support the position of one seeking to invoke the doctrine of laches. *Powell v. Zuckert*, 366 F.2d 634, 638 (D.C.Cir. 1966). The burden of proof thereon rested on Kimble, which she failed to sustain. She neither asserted nor attempted to prove the loss of any demonstrative evidence which would have aided or benefited her. She neither asserted nor attempted to prove that any witnesses were unavailable who could have aided or benefited her. As a matter of fact all persons who were privy to the two incidents which she claims should have been barred by laches testified at the hearing. Moreover, the separate components which come into play in determining applicability vel non of the doctrine of laches must be balanced in each case by weighting each component in accordance with the particular facts and circumstances presented. When such is done in the instant case the scales tip in favor of rejecting application of the doctrine of laches.

Cases involving termination of tenured teachers frequently project an aura of ambivalence, thereby giving indelible substance to the admonitory principle that courts sitting in judicial review should not substitute their judgment on the evidence in lieu of that of the decisional administrative body. The scope of judicial review of administrative decisions in contested cases is sharply etched and commands compliance in order to protect against unwarranted judicial excursions into matters exclusively within the province of the appropriate administrative tribunal. See *Phipps v. School District*, 645 S.W.2d 91, 95–96 (Mo. App.1982).

On the basis of what has heretofore been said, this court holds that the decision and order of The Worth County R–III Board of Education should be, and hereby is, affirmed. Accordingly, the judgment of the Circuit Court of Worth County is reversed and the cause remanded with directions to the Circuit Court of Worth County to enter judgment affirming the decision and order of The Worth County R–III Board of Education.

Judgment reversed and cause remanded with directions.

LOWENSTEIN, J., concurs in opinion of SOMERVILLE, P.J.

NUGENT, J., concurs in separate concurring opinion.

NUGENT, Judge, concurring.

I concur with Judge Somerville's able majority opinion but I respectfully disagree with the way it arrives at its conclusion.

Plaintiff is a tenured teacher and the mother of two grown children. At the time of the hearing before the school board, plaintiff had been a teacher for over sixteen years. The teacher performance reports rendered each year by her superiors were good. In March, 1981, the report included these comments: "Does a fine job. Does a good job of teaching." Under the heading "Professional Characteristics" appears the comment, "Very co-operative in anything I've asked." Finally, the principal concluded with, "She is a fine librarian." Mrs. Kimble was the elected secretary-treasurer of the Community Teachers' Association. She and another teacher had founded and for three years had operated twice-yearly book fairs to raise money for the school library. She had been responsible for handling those funds.

In the fall of 1981 plaintiff's activity on behalf of the teachers' association had brought her into sharp conflict with the Superintendent of Schools, Mr. Bruner, her chief accuser. Apparently he thought that Mrs. Kimble had personally appealed to individual school board members in violation of board policy. Mrs. Kimble testified that in her earlier confrontation with Mr. Bruner he had threatened to "have" her Missouri teacher's certificate, that he would see to it that she would never teach in their school again and had said, "You better watch everything you do from now on, because I would love to slap you with an unprofessional conduct suit." Mr. Bruner denied making those threats, but he testified that he had told Mrs. Kimble on November 19, 1981, that "any future problems of this nature would be handled by a dismissal procedure."

The statement of charges filed against Mrs. Kimble read as follows:

1. Immoral conduct as evidenced by your taking and continued lying concerning the circumstances surrounding the taking of a certain set of books, namely *Through Golden Windows*, from the Gum Drop Book Company, at Bethany, Missouri, on the 11th day of February, 1982, and continuing until said books were brought into the Elementary Principal's office of said school district by yourself on the 18th day of February, 1982.

Other instances involving your immoral conduct as set out above are as follows:

(a) The removal and subsequent return by you of the tea pot from the teacher's lounge during the 1973–74 school year.

(b) The removal and subsequent return of the battery jar in the 1974–75 school year.

(c) The shortage and subsequent replacement by you of gate receipts in the 1976–77 school year.

(d) The removal and subsequent return of Avon jewelry from the Elementary Library during the 1977–78 school year.

(e) The removal of the cookbook from the teacher's lounge in the 1980–81 school year.

As a result of the above course of conduct, you have proven yourself to be untrustworthy and have made it necessary to more closely supervise your school activities and responsibilities than is necessary with the rest of the teachers and this had adversely affected the normal operation of the educational system and its activities.

. . . .

You are hereby suspended with pay from this date from the active performance of your duties until a decision is rendered by the Board of Education.

All but three of these charges were dismissed prior to defendant's hearing.

Because of the deference this court must accord to the school board's decision, I agree with the majority that the whole record includes competent and substantial evidence to support a finding that the plaintiff "is guilty of the immoral conduct of untruthfulness and taking property not her own without consent or permission."

The evidence adduced at the hearing was as follows.

### The Teapot Incident:

During the 1973–74 school year, a teapot on loan to the school disappeared from a shelf in the teachers' lounge. A sign was placed in the lounge asking for its return. One day shortly thereafter, teacher Ann Waldeier was in the lounge and noted that the teapot was still missing. As she left the lounge, she noticed the plaintiff walking into the lounge with a manilla envelope under her arm. The envelope was not in the usual flattened condition. Ms. Waldeier continued to watch the door to the lounge and saw that no one else entered or came out. From where she was standing she could not see the other door to the lounge. When the plaintiff came out of the lounge, Ms. Waldeier reentered and saw the teapot on the shelf and a manilla envelope in the trash.

Former Superintendent of Schools, Phil Burmeister, testified that he, Mrs. Kimble, Norma Maudlin, and Ann Waldeier met and discussed the return of the missing teapot. (Ms. Waldeier had testified that she was not present when Mr. Burmeister discussed the incident with the plaintiff.) According to Mr. Burmeister, Mrs. Kimble stated that she had found the teapot in the library. He asked her why she did not present the teapot to him "rather than just taking it into the lounge and leaving it." When asked about Mrs. Kimble's response, he said "I don't remember any." Neither he nor anyone under his supervision had given Mrs. Kimble permission to take the teapot.

Mrs. Kimble testified that she did not remember anything about the teapot and that she never stole a teapot.

### The Gate Receipts Incident:

During the 1976–77 school year, Judy Hoakison, a teacher, and the plaintiff worked together taking money for basketball games at the gate. At one of those games, Ms. Hoakison left the gate table and went into the gym for no longer than five minutes. She testified that when she left the table some gate receipts money was under the cash box. Upon her return, she saw Mrs. Kimble taking money "out from under the cash box and putting it into her purse." She equivocated in her testimony whether she knew the money she saw Mrs. Kimble put in her purse was the same money that had been under the cash box. Ms. Hoakison admitted that her memory of the event was not as good now as it was at the time of the occurrence sometime in 1976–77.

Eldon Cowles, Superintendent of Schools in 1976–78 testified that he called Mrs. Kimble into his office about the gate-receipts incident. She denied that she ever took any monies from the receipts. She explained that she was making change for her child. Mr. Cowles said that a twenty dollar bill seen at an early count of the money was gone at the end of the game. Although he admitted that under their accounting system no way existed to confirm

a shortage, his "impression [was] that the amount of money wasn't there." He testified that Mrs. Kimble wrote a twenty dollar check to the school when confronted with the incident and that he considered the matter closed at that time. He stated, "It was understood between us that that was it. That took care of it."

The plaintiff testified that she never took monies from the gate receipts and that she did not find in her cancelled checks for December, 1976 and January, 1977, any twenty dollar check to the school. Her bank statements and checks for December, 1976 and January, 1977, were admitted into evidence. Although no twenty dollar check to the school was included in the exhibits, the December, 1976 bank statement shows that two twenty dollar checks were written. Only one of these twenty dollar checks is included in the exhibits.

*The Book Incident:*

The school board's evidence was as follows:

On Thursday, February 11, 1982, Mrs. Kimble went to the Gum Drop Bookstore in Bethany, Missouri. She selected three boxes of books worth approximately $400. One box contained a set entitled *Through Golden Windows*. The next morning, Mrs. Rose Findley, principal of the elementary school, and Marsha Scott saw this set in the library of the elementary school before school started that morning. On Monday, February 15, Mrs. Kimble called the bookstore and talked to Pam Fitzgerald, secretary of the firm. Mrs. Kimble told her that the set of *Through Golden Windows*, was not put into her car when she left the bookstore warehouse and that she did not have them when she got to school. An unproductive search of the warehouse was made.

Patty Hall, another secretary, talked with Mrs. Kimble after she made her call to the bookstore. She told Patty Hall that she had not picked up the set of books in

question and that she had called the bookstore and that they were going to send another set. Pam Fitzgerald related plaintiff's message to Gail Fitzgerald, one of the owners of the Gum Drop Bookstore. Ms. Fitzgerald checked with the warehouse workers. They said that plaintiff had taken the missing books and put them in her car herself. Ms. Fitzgerald then called the school unsuccessfully trying to reach Mrs. Kimble. She left a message with Betty Calhoun, a school secretary. The message read:

> Gum Drop Books called and said they couldn't find the books, *Through Golden Windows*. The boys that helped you load them said they could remember you carrying them to the car.

The plaintiff did not return Ms. Fitzgerald's call. Ms. Findley, the principal, became aware of the situation on Monday, February 15, when the message was brought to her. On February 18, Ms. Findley called the bookstore and brought plaintiff to the phone. Early in the conversation, Mrs. Kimble stated that she received only two boxes of books. Ms. Findley heard Mrs. Kimble say on the telephone, "No, they are not in the trunk," and "Let's not worry. They'll turn up somewhere." Ms. Findley contacted Superintendent Bruner on Wednesday, February 17, about the missing books. On Thursday, the 18th, after Mrs. Kimble's telephone conversation with Ms. Fitzgerald, Mr. Bruner confronted the plaintiff with the problem. Her first statement was, "I don't know where they are." She also said that she had picked up three boxes of books in Bethany. Mr. Bruner indicated that he expected the books returned to the school. After the close of school that day, Mrs. Kimble went home and then returned to school and delivered the missing books to Ms. Findley.

Plaintiff's testimony regarding the book incident was as follows:

After she had purchased the books at the Gum Drop Bookstore and had them put into her trunk by the employees of the

bookstore, she drove to St. Joseph and stayed overnight at her daughter's. A snow fell that night and she drove to school early the next day before the snow plows were out. By the time she got to school, she had a severe headache. She asked another person to remove the books from the trunk and to put them in the library. Although very ill, she stayed at school all day. "Evidently," on her way out, she "picked up this box of *Through Golden Windows* to take them home, look at and catalog over the week-end," and she "evidently put it in the trunk of the car and went home." She went to bed and slept until the next morning. On Monday, she went down to look at the books in the library and the box was not there. She then called the bookstore and told them that they evidently did not get one box of the books when she was there on Thursday. She asked them to check and see if they were still down there. She then went to the office and told the school secretary to hold the bill because one of the boxes was not at the school and that they needed to wait until they got it straightened out before they paid the bill. On occasion she took books home to catalog them. She did so to save the school sixty cents for catalog cards. She normally put the books in the back seat or in the seat beside her when she took them home. After being confronted by the principal about the missing books, she searched the library, the work rooms, and all of the teachers' rooms. She then went home and, although she knew they were not there, she looked all around home. As she was sitting down she thought, "Well, maybe they are still out in the car. So I went out and looked in the car again, and I looked in the trunk and that's where they were." She then brought the books back and returned them.

Evidence was also produced by the school board that extra supervision of Mrs. Kimble was needed and that these incidents had a negative and detrimental effect on the students, faculty, and the educational process of the school district.

*Discussion:*

While I agree with the majority's ultimate finding that these incidents may be said to constitute "immoral conduct," § 168.114.1(2),[1] rendering the plaintiff "unfit to teach," *see Ross v. Robb,* 662 S.W.2d 257, 259 (Mo.1983) (en banc), I arrive at that conclusion for different reasons. None of the three complaints against Mrs. Kimble charge that she intentionally and wrongfully deprived the district of its property. Moreover, the majority apparently thinks that the school board is not required to prove that the teacher intentionally and wrongfully deprived the district of its property, that *any* taking of the property would constitute immoral conduct. The court's opinion states that "[t]he taking of property belonging to another, notwithstanding its return when confronted with such wrongdoing, breaches even the most relaxed standards of acceptable human behavior, particularly so with regard to those who occupy positions which bring them in close, daily contact with young persons of an impressionable age."

Indeed, if one intentionally and wrongfully takes another's property, no matter what the value, such conduct would constitute "immoral" behavior. But, I cannot agree that *any* taking of property, particularly after it is later returned, constitutes immoral conduct. If so, a teacher could be discharged if he inadvertantly took a school pencil or a book home, forgot about it for a week, and then returned it. Similarly, a teacher could be discharged if he intentionally took a school grade book home to compute his students' grades and later returned it to school. The former example illustrates a taking which lacks intent and the latter illustrates a taking which is not wrongful. The legislature, in enacting § 168.114.1(2) could not have intended that such conduct would amount to immoral

---

**1.** All sectional references are to Revised Statutes of Missouri, 1978.

conduct warranting termination of a teacher's contract. Because this limited issue is one of statutory interpretation, a question of law, we are free to substitute our own judgment. *See National Labor Relations Board v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944). Therefore, I would say that to hold the taking of property to constitute immoral conduct, the court must be convinced that the taking was intentional and wrongful.[2]

Starting with that premise, the next issue is then whether or not competent and substantial evidence appears upon the whole record to support the conclusion that the plaintiff intentionally and wrongfully deprived the district of its property. *See Harrod v. Board of Education*, 500 S.W.2d 1, 6 (Mo.App.1973); § 536.140(3). This inquiry, unlike the earlier issue, is a mixed question of law and fact. And, "where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited." *National Labor Relations Board v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).[3]

The school board here determined that the plaintiff's acts constituted immoral conduct. I would affirm this determination for two reasons. In the first place, the whole record contains competent and substantial evidence to support the factual finding that the plaintiff intentionally and wrongfully deprived the district of its property. Next, the whole record also includes competent and substantial evidence to support the finding that the plaintiff was untruthful with school personnel and was untruthful at her hearing.

Finally, the record contains substantial evidence that plaintiff's conduct has rendered her "unfit to teach." *Cf. Thompson v. Southwest School District*, 483 F.Supp. 1170, 1182 (W.D.Mo.1980) (where no evidence was developed indicating that plaintiff's conduct rendered her unfit to teach).

---

**2.** Fortunately, because the property in question in this case was of some value, although relatively slight, we need not address the moral philosopher's question whether taking of property of little or no value constitutes "immoral conduct."

**3.** There the issue was whether news boys were "employees" of newspaper publishers as used in the National Labor Relations Act. The NLRB refused to follow common-law tort rules in defining an "employee," and defined the term in the context of policies underlying the NLRB. They defined employees as any workers who need the Act's protection. The Supreme Court held that "as a matter of law, the common law approach would be wrong." But it left it to the Board to decide, as a question of fact, whether particular individuals were employees within the "need for protection" test. Thus the Court found that "the Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." *National Labor Relations Board v. Hearst Publications, Inc., supra,* at 131, 64 S.Ct. at 861.