**In re the Matter of Steven COCHRAN, Plaintiff/Appellant,**

v.

**BOARD OF EDUCATION OF MEXICO SCHOOL DISTRICT NO. 59, Defendant/Respondent.**

**No. 58692.**

Missouri Court of Appeals, Eastern District, Northern Division.

July 23, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 29, 1991.

Application to Transfer Denied Oct. 16, 1991.

Bradford A. Brett, Brett, Erdel, Tanzey and Hamlett, P.C., Mexico, for plaintiff/appellant.

Louis J. Leonatti, Ann P. Hagan and Paul A. Seigfreid, Seigfreid, Runge, Leonatti & Pohlmeyer, P.C., Mexico, for defendant/respondent.

CRANE, Judge.

Plaintiff Steven Cochran appeals from the judgment of the Circuit Court of Audrain County upholding the action of the defendant Board of Education of Mexico School District No. 59 approving his termination as a welding instructor with the Mexico Area Vocational Technical School. We affirm.

### Facts

The evidence, considered in the light most favorable to the school board's decision, reveals that Steven Cochran had been employed as a welding instructor at the Mexico Area Vocational Technical School from 1979 until his termination by the defendant school board on November 29, 1989. His teaching contract gave him the rights of a tenured teacher under the Missouri Teacher Tenure Act. He also oversaw the daily operation of the Mexico school district's participation in the federal surplus property program. This federal program, administered through a state agency, enables not-for-profit organizations such as the school district or its vocational schools to purchase items previously used by the federal government at a substantially reduced price. Where the "acquisition cost," defined as the federal government's original price, exceeded $3,000.00 for an item, the not-for-profit entity purchasing the item was restricted from disposing of the property for an eighteen month period. The entity was required to report the status of purchasers from time to time.

Cochran was first authorized as the school district's representative for the program by letter dated May 29, 1984, addressed to the State Agency for Surplus Property in Jefferson City, Missouri, from Donald Palmer, then superintendent of schools. The school district subsequently purchased various items through the surplus property program including a fork lift, die casting machine, profile projector, scrap aluminum, titanium and screw machines. Cochran handled the negotiations for both the sale and purchase of surplus property. He would locate the items at the surplus property agency's yard in Jefferson City, and put a hold on items of interest. After his return, he would then type up a purchase order that Mr. David Wilkinson, the director of the vocational school, would sign. Wilkinson would forward the purchase order to central office to be issued. Cochran was responsible for preparation of the surplus property utilization reports concerning surplus property the district acquired. Cochran prepared some reports which indicated purchases were still in inventory when they had been sold in violation of the restriction.

After questions were raised by a standard audit and articles in the press, and as a result of a federal investigation, the school board requested its auditor and its attorney to investigate allegations of impropriety in the surplus property program. After receiving the results of the investigation, the school board issued a warning letter to Cochran on July 26, 1989, for "insubordination" and "immoral conduct" regarding the surplus property program. Cochran and his attorney met with interim

superintendent John Dean on August 23, 1989. As a result of the violations of federal regulations governing the surplus property program, the school district negotiated a settlement with the General Services Administration which required it to pay the United States government over $54,-000.00 and to arrange for and pay the cost for the return of a lathe to the surplus property agency office. The settlement was finalized in November, 1989.

On October 18, 1989, the board issued a charges letter to Cochran advising him of the school board's interim decision to terminate him and outlining the basis for its charges of immoral conduct. There were three allegations of immoral conduct: (1) that Mr. Cochran filed at least four false reports with the State Agency for Surplus Property; (2) that he was in charge of the day-to-day operations of the Mexico Area Vocational Technical School Surplus Property Program and that various violations of regulations were found in the way the Vo-Tech School utilized certain pieces of surplus equipment; and (3) that he filed an application to teach in the adult education program at the Mexico Area Vocational Technical School that contained incorrect personal information which caused the district to overpay Cochran and that he refused to return the overpaid funds. He also was provided with a notice outlining his rights to a hearing.

### Administrative Proceedings

The school board conducted a hearing on the evenings of November 13 and 14, 1989, to hear evidence of the charges. Cochran filed a motion with the board to disqualify the board and appoint a circuit judge as hearing officer on the grounds that the board was biased and the publicity surrounding the case tainted the proceedings. The school board took the motion with the case and ultimately denied the motion when it issued its findings of fact and conclusions of law. Two weeks after the hearing the board met in two executive sessions to deliberate and vote on the charges. The school board voted 4–2 to terminate Cochran.

The majority of the board made the following conclusions:

(a) that Cochran was responsible for the preparation of four Surplus Property Utilization Reports which falsely indicated that equipment was still owned by the school district and was on school district property, when in fact it had been sold;

(b) that Cochran directed the Mexico school district's participation in the government's Surplus Property Program, and he bore part of the responsibility for the District's failure to comply with the program's requirements; and

(c) that Cochran's application to teach in the Adult Education Program contained false information. However, the school board found insufficient proof that this false information resulted in increased pay.

The two dissenting members of the board issued a separate opinion reflecting their belief that the evidence did not support all of the conclusions of the majority and that disciplinary action other than termination was warranted.

### Circuit Court Proceedings

Cochran thereafter filed a petition for review with the circuit court along with a motion regarding pre-hearing unfairness and post-hearing irregularities. The motion was countered by affidavit. The circuit court denied the motion and upheld the board's decision.

### Standard of Review

We review the findings and conclusions of the administrative agency rather than the judgment of the circuit court. *Kramer v. Mason*, 806 S.W.2d 131, 134 (Mo.App. 1991); *Hudson v. Wellston School District*, 796 S.W.2d 31, 33 (Mo.App.1990). Our scope of review is limited to a determination whether or not the decision of the agency is supported by competent and substantial evidence upon the record as a whole, whether the decision was arbitrary, capricious or unreasonable, or whether the administrative action constituted an abuse of discretion. *Gamble v. Hoffman*, 732 S.W.2d 890, 892 (Mo. banc 1987); *Um-*

*phries v. Jones,* 804 S.W.2d 38, 40 (Mo.App. 1991). We may not substitute our judgment of the evidence. *Kramer,* 806 S.W.2d at 134. In addition, we must consider the evidence in the light most favorable to the agency decision, together with all reasonable inferences where supported. *Id; Hudson,* 796 S.W.2d at 33. If evidence before an administrative body would warrant either of two opposed findings, we are bound by the administrative determination and it is irrelevant that there is evidence to support a contrary finding. *Kramer,* 806 S.W.2d at 134; *Hudson,* 796 S.W.2d at 33. We likewise defer to the determination of the credibility of the witnesses by the administrative tribunal. *Kramer,* 806 S.W.2d at 134; *Hudson,* 796 S.W.2d at 33.

The action of the agency must be supported by substantial evidence. Substantial evidence has been defined as:

> evidence which, if true, has probative force upon the issues, i.e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them; it is evidence from which the trier or triers of the fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced.

*Fujita v. Jeffries,* 714 S.W.2d 202, 206 (Mo. App.1986) quoting *Collins v. Division of Welfare,* 364 Mo. 1032, 270 S.W.2d 817, 820 (Mo. banc 1954). "There is a strong presumption of validity in favor of a school board's decision because the courts are reluctant to interfere with a school board's broad discretion in matters affecting school management." *Beck v. James,* 793 S.W.2d 416, 418 (Mo.App.1990) quoting *Bell v. Board of Education,* 711 S.W.2d 950, 955 (Mo.App.1986).

### Due Process

For his first point Cochran asserts that the school board's hearing violated § 536.-140.2(5) RSMo 1986 and his rights to constitutional and administrative due process in that the attorney for the school board had multiple roles as investigator and prosecutor on behalf of the school superintendent during the hearing, that he had participated in the final deliberations of the school board and that the board was biased. We examine first the allegations concerning the role of the attorney for the school board, Mr. Louis Leonatti.

The record reflects that Leonatti assisted in the audit of the Mexico school district's participation in the surplus property program. Leonatti took a sworn statement from Cochran in March 1989, before the superintendent sent him the warning letter. At Cochran's dismissal hearing, Leonatti prosecuted the case on behalf of the superintendent of schools. During the two day hearing, Mr. G. Andy Runge, a principal in Leonatti's law firm, acted as the legal advisor to the school board. Two weeks later Leonatti attended the school board's closed executive session while it deliberated. He was elected acting secretary of the meeting. He attested by affidavit that his role was to take minutes and advise the board of legal procedure. He advised the board 1) that it could only consider exhibits and evidence presented at the hearing; 2) that the burden of proof was a preponderance of the evidence; 3) that their decision had to be in the form of written findings of fact and conclusions of law; 4) that they should consider each of the charges separately and take a separate vote on each charge and 5) that a teacher could be terminated for immoral conduct only if that conduct affected his ability to teach. After the board reached its decision, he drafted proposed findings of fact and conclusions of law for the majority and assisted the minority in putting its opinion in proper legal form. Leonatti presented the drafts of both the majority and the minority to the board at its meeting two days later. The board excused him while they discussed the drafts and made revisions. They called him back to advise him of their revisions. Cochran's attorney was not present for either of these executive sessions.

■ The essence of due process of law is that an aggrieved person must be afforded a procedural remedy to seek redress for

deprivation of a claimed right. *Harrisburg R-VIII School District v. O'Brian*, 540 S.W.2d 945, 949 (Mo.App.1976). "[D]ue process is satisfied if there be either an administrative hearing subject to judicial review or the right to have a hearing in a court which may adequately review the administrative decision." *Harrisburg*, 540 S.W.2d at 949, quoting *State ex rel. Leggett v. Jensen*, 318 S.W.2d 353, 358 (Mo. banc 1958).

■ Cochran asserts that he was deprived of due process because the attorney acting on behalf of the school board had multiple roles and was present during the deliberations of the board. Courts generally allow the attorney for the school board wide latitude in participating in dismissal proceedings against a tenured teacher. *Ross v. Robb*, 662 S.W.2d 257 (Mo. banc 1983); *Shepard v. South Harrison R–II School District*, 718 S.W.2d 195 (Mo.App. 1986); *Eddington v. St. Francois County R–III Board of Education*, 564 S.W.2d 283 (Mo.App.1978); *Harrisburg*, 540 S.W.2d at 950.

In *Ross*, a tenured teacher dismissed for "immoral conduct" asserted that he was denied a fair trial because the participation of the board's attorney in the drafting of charges and suggested findings of fact ultimately adopted by the board represented an abdication of the board's deliberative function rendering the board prosecutor, judge, and jury. 662 S.W.2d at 260. Our Missouri Supreme Court disagreed, stating as follows:

> That an administrative body initiates a charge and then tries it does not alone vitiate the proceedings, if judicial review is provided. *Aubuchon v. Gasconade County R–1 School District*, 541 S.W.2d 322, 326 (Mo.App.1976). And the active participation of a school board's attorney in the conduct of a hearing, including the examination and cross-examination of witnesses, does not in itself deprive one of a fair trial; nor does the preparation of findings of fact and conclusions of law. *Eddington v. St. Francois Cty. R–*

*III Bd. of Ed.*, 564 S.W.2d 283, 286 (Mo. App.1978).

*Ross*, 662 S.W.2d at 260.

In *Shepard*, a teacher terminated for violation of corporal punishment policy argued that the board was not equally impartial as a hearing tribunal, since it and its attorney participated in investigating and prosecuting the charges against her. *Id.* at 197. She contended she did not receive a fair trial. *Id.* at 199. Relying on *Ross* the court held that the combination of investigatory, prosecutive and adjudicatory roles by a school board and its attorney in a teacher termination proceeding does not result in a denial of fair trial unless the board is so prejudiced that it has predetermined to reach a particular result no matter what the evidence. *Shepard*, 718 S.W.2d at 199.

In *Eddington*, this court rejected the dismissed teacher's claim that the school board's attorney improperly participated in the decision for terminating her employment. 564 S.W.2d at 286. The school board's attorney took an active part in the proceedings. He examined and cross-examined witnesses, prepared the findings of fact and conclusions of law for the trial court's consideration, and gave advice on how the hearing should be conducted. Moreover, he had previously represented all but one of the school board members in the teacher's sex discrimination case against the board in federal district court. *Id.* We found these factors did not deny the teacher a fair trial, nor was there any evidence of unfairness in the actions of the school board's attorney. *Id.* We concluded that the mere fact of active participation in the hearing by the school board's attorney did not render the hearing unfair or that the school board was improperly influenced by its attorney. *Id.*

In *Harrisburg*, the teacher contended her hearing was unfair because the school district's regular attorney represented the district at her dismissal hearing. The court observed that the issue whether active participation on behalf of a board of education by its regular counsel at a hearing resulting in the discharge of a permanent teacher, *vis-a-vis* a charge that such gives rise to

an "unfair" hearing, had not previously been addressed in Missouri. 540 S.W.2d at 950. The *Harrisburg* court found persuasive the Illinois case of *Yuen v. Board of Education of School District No. U–46*, 77 Ill.App.2d 353, 222 N.E.2d 570, 573 (1966), which had held that active participation by a board of education's regular counsel at a hearing eventually resulting in the discharge of a permanent teacher did not render the hearing unfair. 540 S.W.2d at 950. The court in *Harrisburg* commented that nothing in the record before it implied that the board of education's regular counsel participated in the deliberative process that resulted in the teacher's discharge. *Id.* The court held that, since the board of education of the school district alone shouldered the burden and duty of determining whether the teacher should be discharged because of the charge leveled against her, the hearing was not unfair. *Id.*

Cochran urges us to follow the Colorado decisions of *Weissman v. Board of Education of Jefferson County School District No. R–1*, 190 Colo. 414, 547 P.2d 1267 (banc 1976) and *Board of Education of Arapahoe County School District No. 6 v. Lockhart*, 687 P.2d 1306 (Colo. banc 1984). In *Weissman,* the Colorado Supreme Court found no due process violation but advised: "In the future, counsel who has [prosecuted a case against the teacher during the dismissal hearing] should take no part in the final deliberations of the board, in order to avoid any appearance of impropriety or unfairness." *Weissman,* 190 Colo. at 425, 547 P.2d at 1276.

In *Lockhart,* the attorney who had prosecuted the case against the teacher not only participated in the school board's deliberative session but actually informed the board that the evidence in the record supported the hearing officer's findings of fact and advised the board that the attorney representing the teacher should not be permitted to make a statement. The Colorado Supreme Court found the board's conduct to be clearly in violation of its admonition in *Weissman* and the procedure was inimical to the appearance, if not the reality, of fairness. *Lockhart,* 687 P.2d at 1309.

Cochran also relies on an Illinois case, *Miller v. Board of Education of School District No. 132,* 51 Ill.App.2d 20, 200 N.E.2d 838 (1964), for the proposition that a teacher did not receive a fair hearing because of the multiple capacities in which the school board and its attorney were functioning. The school's attorney in *Miller* had advised the board to exclude all evidence, testimony and offers of proof proffered by the teacher's attorney. We do not find any of these out-of-state cases controlling.

▮ The facts in this case demonstrate that Leonatti's conduct was proper under *Ross, Shepard, Eddington* and *Harrisburg.* The minutes of the executive session indicate that a board member questioned the propriety of Leonatti's presence at the executive session. In response, Leonatti expressly stated that he was "merely present to provide technical assistance to the Board, to help them reduce their decision to writing, and to inform them of any legal requirements." He stated he was not present to comment on the evidence or to express any opinions. The minutes further indicate that Leonatti reminded the board during the meeting that "they could only consider evidence presented at the hearing and the exhibits, and could not consider matters outside of the scope of the testimony or the evidence presented at the hearing."

Leonatti, in addition to preparing the board's findings, also assisted the dissenting board members in drafting their separate statement. In response to Cochran's motion in circuit court alleging pre-hearing and post-hearing irregularities, Leonatti attested by sworn affidavit that he at no time expressed any opinion or comment to the board during its deliberations.

The record is bereft of any evidence that Leonatti actively participated in the actual decision-making of the school board or that he influenced the outcome of the school board's deliberations. Cochran has not specified why the representation of the superintendent and school board by Leonatti was improper or how it prejudiced him.

The school board permitted Cochran to fully cross-examine all witnesses, call his own witnesses and present evidence at the hearing. At no time did the board exclude evidence offered by Cochran's attorney. Cochran was furnished a transcript of the hearing two days before the board met in its first executive session. The record does not indicate that Cochran was prohibited from submitting his own proposed findings of fact and conclusions of law to the school board or that he requested an opportunity to do so.

In *Ross* the Missouri Supreme Court held that "[a]bsent a showing in the record that, as a result of the attorney's participation, the Board heard the evidence with an unbendable or preconceived notion that petitioner was guilty as charged, no denial of a fair trial occurred." 662 S.W.2d at 260, citing *Harrisburg*, 540 S.W.2d at 950. In this case Cochran was accorded the benefit of judicial review. The record does not reflect that Leonatti's actions resulted in an unfair hearing. As in *Ross*, the record shows that the school board conducted the hearing properly, fairly, and reasonably. The conduct was not that condemned by the Illinois Court of Appeals in *Miller* nor the Colorado Supreme Court in *Lockhart*, nor are we persuaded to adopt the Colorado court's admonition in *Weissman*.

■ Cochran's remaining due process argument is that the board was biased. He first contends that two members of the board, Mr. Chris Miller and Mr. Randy Smith, were shown to be personally biased. He argues that Miller and Smith had prior knowledge of certain facts surrounding the controversy and Cochran's role in the surplus program and that this knowledge tainted their judgment as fact-finders and predisposed them to terminate his employment contract. Cochran also contends that the school board as a whole was biased because it had to pay over $54,000 to the federal government to settle all claims involving federal surplus property and spend several thousand dollars for audits. Additionally, he claims that all school board members were exposed to pre-hearing publicity, comprehensive newspaper coverage, the audit report contents, and the active participation of its attorneys, all of which predisposed the school board to terminate him.

At the beginning of the hearing, Cochran's attorney was afforded ample opportunity to voir dire each of the board members. He subpoenaed and questioned all six board members. During his examination, Miller admitted that he had made a statement in the press that he "was not certain" about a decision to "continue to employ a teacher that falsified his job application". When asked whether Cochran had done anything wrong at the vocational school, Miller responded that his intention was to listen first to the evidence and to make his decision afterwards. He was unsure whether he had made the original motion to terminate appellant. Upon cross-examination, Miller denied that he had an irrevocable committment to terminate Cochran's contract and re-affirmed his willingness to listen to all the evidence presented at the hearing before rendering a decision. Each of the other board members expressed the same commitment to an open mind.

Smith testified that he also had reviewed the audit report. He testified that he had indicated to others that "it's a possibility that there might be money available to people that are participating in this program." However he denied that he had ever told anyone that Cochran was guilty or that he wanted him terminated. He recalled that he had met with Cochran for four to five hours at Cochran's request to tell his side of the story.

■ Prior knowledge of the facts does not by itself create bias. The statutory scheme provides for the school board to both initiate and make the ultimate adjudication. §§ 168.116 and 168. 118 RSMo 1986. The legislative enactment creates this dual role. An argument directed against a school board's prior knowledge of the facts before the hearing is held ignores reality. *Harrisburg, supra,* 540 S.W.2d at 950. *Harrisburg* recognizes that the preferment of charges against the teacher presupposes the board's prior knowledge of

the facts. *Id.* The critical inquiry is whether a review of the record "indicates that the board of education's prior knowledge of facts resulted in an irrevocable commitment on its part to terminate [the teacher], regardless of what the evidence at the hearing, pro or con, might reveal, or that it conducted the hearing and passed judgment with an unbendable or preconceived notion that [the teacher] was guilty as charged." *Id.* See also, *Mo–Kan Airport Passenger Service, Inc. v. City of Kansas City,* 689 S.W.2d 641, 643 (Mo.App. 1985), in which the court observed that "[t]he board, of necessity, is informed of the charges prior to the commencement of termination proceedings. In those cases, the board is informed of certain facts in order to make an informed decision on the commencement of the termination procedure."

The record demonstrates unequivocally that each board member swore that he was not irrevocably committed to Cochran's termination, thus, the argument that the bias of two members or the bias of the board as a whole denied him due process lacks merit. Point one is denied.

### Sufficiency of the Evidence— Immoral Conduct

For his second point Cochran asserts that no substantial and competent evidence supports a link between the wrongdoing found by the school board and his ability to teach in the classroom. Cochran argues that the actions found by the board to be "immoral" should instead be characterized as "mistakes" warranting that he be charged with no more than incompetency, inefficiency or insubordination. He contends that the procedure for an incompetency dismissal was not followed in his case, citing *Selby v. North Callaway Board of Education,* 777 S.W.2d 275 (Mo.App.1989) which discusses the procedural requisites for dismissal based upon incompetency. Cochran was terminated for immoral conduct under § 168.114.1(2) RSMo 1986, and not incompetency, inefficiency or insubordination under § 168.114.1(3). Accordingly, *Selby* is irrelevant.

■ Cochran next asserts that the term "immoral conduct" is "so vague as to be undefinable." The statute provides no definition of this term. In *Ross,* our Missouri Supreme Court rejected the claim that this provision was unconstitutionally vague because the phrase is part of a statutory scheme which, construed with the other subsections of the statute, is "capable of being given a more precise judicial construction so as to avoid the vagueness issue." *Thompson v. Southwest School District,* 483 F.Supp. 1170, 1180 (W.D.Mo. 1980). The court adopted the definition in *Thompson* that immoral conduct means "conduct rendering plaintiff unfit to teach." *Ross,* 662 S.W.2d at 259. Furthermore, immoral conduct under the statute is not limited solely to sexual conduct. It includes other conduct such as theft of school property. *Kimble v. Worth County R–III Board of Education,* 669 S.W.2d 949, 953 (Mo.App.1984), *cert. denied,* 469 U.S. 933, 105 S.Ct. 331, 83 L.E.2d 268 (1984).

■ *Thompson* set out eight factors to be considered in determining whether a teacher's immoral conduct renders him unfit to teach. Three of these factors are relevant to the school board's decision:

"... (2) the likelihood that the teacher's conduct will have adversely affected students or other teachers; (3) the degree of the anticipated adversity; ... (5) extenuating or aggravating circumstances surrounding the conduct;...."

483 F.Supp. at 1182.

The school board addressed these factors as follows in its conclusions of law:

The Board of Education is aware of the level of instruction and effort which Mr. Cochran has put into his past classroom work. However, the Board cannot ignore the consequences from the charges set forth in Exhibit 7 which have resulted to the School District because of the violations of the Federal Property Management Regulations. The District has been required to pay over $54,000.00 to the United States government. The former Superintendent of Schools, Dr. Ed Ferguson, has resigned his position. Mr. Cochran's supervisor, Mr. Dave Wil-

**64**

kinson, received a severe reprimand from the Board of Education and was placed on probation.

In evaluating the charges against Mr. Cochran and determining whether they constitute "immoral conduct", the Board must consider whether Mr. Cochran's conduct renders him unfit to teach in a classroom. A classroom teacher must set an example for his students. His integrity must be beyond question. This is a key element in the student/teacher relationship. It is our conclusion that this fundamental requirement for teaching in the classroom will be severely compromised if Mr. Cochran were to resume his teaching duties within the District.

The record contains competent and substantial evidence to support these findings. The superintendent of schools, Mr. John Dean, testified that the charges compromised Cochran's integrity and respect in the classroom. Dean testified that Cochran's actions "offend the sense of right and wrong." The director of the vocational school and Cochran's immediate supervisor, Mr. Dave Wilkerson, testified that Cochran had always been an outstanding and exceptional teacher—a "master teacher". He added, however, he would prefer his children not be taught by a teacher who lied on a teacher application and that it would be a difficult situation to explain to a classroom. He noted the problems with the surplus property program had caused morale problems among instructors.

■ Cochran cites evidence regarding his ability to teach. The board never questioned appellant's teaching ability. It is not required that there be evidence of or a specific separate finding of "unfitness to teach". What is required is that there be some nexus between the immoral conduct shown in the evidence and fitness to teach. *Ross,* 662 S.W.2d at 259; *Schmidt v. Board of Education of Raytown Consolidated School District No. 2,* 712 S.W.2d 45, 48 (Mo.App.1986). The school board's determination that such a nexus existed was supported by substantial evidence. Point two is denied.

*Sufficiency of the Evidence—Misconduct*

■ For his third point Cochran argues that the school board's decision was not supported by substantial and competent evidence. Cochran's argument under this point begins with a challenge to the board's charge and ultimate finding that Cochran had supplied false information on a job application in 1988 to teach in the adult education program at the district's vocational school. This contention does not appear anywhere within the point relied on and, consequently, is not preserved for review. *Carnahan v. American Family Mutual Insurance Co.,* 723 S.W.2d 612, 614 (Mo.App.1987).

Cochran's second contention, that the board's vote on whether appellant was "in charge" was tied, is not supported by the record. The minutes clearly reflect that the tied vote occurred on the motion to *reconsider* its previous vote of 4–2 in order that the vote might be unanimous.

■ Cochran next points to evidence that he was not in charge of the program and had no administrative responsibilities over it. However, it is undisputed that Cochran's signature appears on the distribution documents and invoices regarding the machinery and equipment purchased from the surplus property program. These same forms contain on their reverse sides the regulations and conditions attached to the surplus property. These documents also list Cochran as the school's representative for the program. More than one witness testified Cochran was primarily responsible for the day-to-day operations of the surplus property program. Cochran himself testified that recommendations for sales or purchases of surplus property were made by him 70% to 75% of the time. Even though no set policy concerning the surplus property program existed, there was evidence that Cochran was the driving force behind the district's utilization of and participation in the surplus property program.

The evidence before the school board warranted its findings of fact. We are bound by this determination and it is irrelevant that there may be evidence for a con-

trary finding. *Hudson,* 796 S.W.2d at 33; *Beck,* 793 S.W.2d at 419. Point three is denied.

The decision of the school board is upheld and the judgment of the trial court is affirmed.

KAROHL, P.J., concurs in result.

AHRENS, J., concurs.