Jeffrey L. **LAGUD,** Respondent,

v.

**KANSAS CITY MISSOURI BOARD OF POLICE COMMISSIONERS,** Angela **Wassan–Hunt,** President; James **Wilson,** Vice President; Terry **Brady,** Treasurer; Karl **Zobrist,** and Mayor Kay **Barnes,** Appellants.

No. WD 68763.

Missouri Court of Appeals, Western District.

Oct. 7, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 25, 2008.

Application for Transfer Denied Jan. 27, 2009.

---

William Edward Quirk, Kansas City, MO, for Appellants.

Sean P. McCauley, Overland Park, KS, for Respondent.

Before JOSEPH ELLIS, P.J., LISA HARDWICK and JOSEPH DANDURAND, JJ.

JOSEPH P. DANDURAND, Judge.

This appeal arises from the decision of the Kansas City, Missouri, Board of Police Commissioners ("the Board") to suspend Officer Jeffrey Lagud for misconduct concerning the collection of a urine sample. Officer Lagud appealed. Upon review, we find no error and affirm the Board's decision.

## Background

On September 10, 2000, Officers James Carmody and Jason Crump arrested James Russell on suspicion of driving under the influence. At the time of his arrest, Mr. Russell could not stand on his own and could not perform any of the field sobriety tests. Mr. Russell was then transported to the Kansas City Police Department's Center Zone Station. Upon arrival, Officer Carmody asked a Drug Recognition and Evaluation (DRE) officer to conduct a drug and alcohol evaluation. Officer Jeffrey Lagud responded and, with the help of Officer Larry Bewick, conducted a number of tests to determine the cause of Mr. Russell's impairment. Officer Lagud then asked Officer Carmody to help him obtain a urine sample from Mr. Russell.

The two officers escorted Mr. Russell to a urinal located between the eastern wall of the holding cell and a four foot high privacy wall. As the sample was collected, Mr. Russell was facing the urinal with his hands handcuffed behind his back, and Officer Lagud was reaching over the privacy wall holding the sample cup to collect the urine. Officer Carmody was standing behind and to the side of Mr. Russell, supporting Mr. Russell because he was fading in and out of consciousness and having difficulty keeping his balance. Officers Carmody and Lagud have differing accounts as to what occurred during the collection of the urine sample.

According to Officer Lagud, he held the specimen cup in his left hand. Using his right hand, he unbuttoned and unzipped Mr. Russell's pants, grasped the pants at Mr. Russell's right hip and pulled them partially down, then grasped the underwear at the same place and pulled them down to expose Mr. Russell's penis. Officer Lagud then switched the specimen cup to his right hand, instructed Mr. Russell to begin urinating, and leaned over the privacy wall to collect the sample. Once the sample had been obtained, Officer Lagud placed the cap on the cup and waited for Mr. Russell to finish urinating. After Mr. Russell had finished, Officer Lagud grasped the right side of Mr. Russell's underwear and pulled them back up. He then pulled up Mr. Russell's pants. Officer Lagud maintained that he never touched Mr. Russell's penis during this process.

Two days after Mr. Russell's arrest, Officer Carmody informally discussed the procedures Officer Lagud had used to collect Mr. Russell's urine sample with Sergeant Carl Abraham, telling him that Officer Lagud had held Mr. Russell's penis while collecting the urine sample. Sergeant Abraham directed Officer Carmody to complete an internal statement, or "191," regarding the incident. Officer Carmody did so on September 14, 2000, in which he wrote:

Upon the request of a urine test Crump stood the subject up and began to remove the handcuffs at which time Lagud told Crump to "leave the cuffs on." Lagud then escorted the subject into a holding cell and asked me to follow. Once at the toilet in the holding cell I stood behind the subject expected Lagud to tell me when he was ready for me to remove the handcuffs, however Lagud just unbuttoned and unzipped the subject's pants then removed his penis from

his underwear and instructed him to begin urinating into a specimen container being held in Lagud's free hand. When the subject had filled the container Lagud aimed the subject's penis in the toilet allowing him to continue urinating before returning the subject's penis back into his underwear and asking me to re-zip and re-button the subject's pants while he secures the collected sample.

Officer Carmody's statement was forwarded to Officer Lagud's supervisor, Sergeant Kim Hannan, to determine whether such actions were appropriate. Sergeant Hannan conducted an investigation into the incident, including a reenactment. She initially recommended that Officers Carmody and Lagud be given polygraph examinations, but when she was told that no polygraphs would be given, she recommended an internal investigation be initiated.

An internal investigation ensued, and a detective interviewed Officers Carmody and Lagud, as well as Mr. Russell, over the next several months. Officer Lagud consistently maintained that he never touched Mr. Russell's penis at any time the night of Mr. Russell's arrest. Officer Carmody also answered questions consistently with his 191. After the internal investigation had been completed, Sergeant Hannan reviewed the file and conducted another reenactment of the events. She concluded that Officer Carmody had not been in a position to see Mr. Russell's groin area during the collection of the urine sample.

After reviewing the internal investigation file and the recommendations from Sergeant Hannan and others in the chain of command, then-Chief of Police Richard Easley filed charges and specifications with the Board requesting Officer Lagud's termination. Officer Lagud was charged with misconduct for violating department policy by obtaining a urine sample by grabbing and holding an arrestee's penis and then denying he had done so.

Both Officers Carmody and Lagud were eventually given polygraph examinations. An examiner with the police department conducted Officer Carmody's examination and found that Officer Carmody was not deceptive in his responses. Officer Lagud's polygraph examination was conducted by an independent examiner, chosen by Officer Lagud, who found that Officer Lagud was not deceptive throughout the testing process. This examiner reviewed the results from Officer Carmody's polygraph, and while the examiner stated it was his belief that Officer Carmody was deceptive as to whether he saw Officer Lagud hold Mr. Russell's penis during the collection of the urine sample, the examiner also acknowledged that both examiners had been trained under different methodologies, and he simply had a different opinion as to the results.

At the hearing before the Board, Officer Carmody conceded that he did not actually see Officer Lagud initially remove Mr. Russell's penis from his pants. However, Officer Carmody stated that while he may not have seen Officer Lagud initially remove Mr. Russell's penis from his underwear, he did see Officer Lagud hold it while collecting the urine sample. Officer Carmody explained that he was surprised Officer Lagud had begun to take the sample without requesting Mr. Russell's hands be uncuffed, so Officer Carmody repositioned himself to see what was occurring. He stated that he saw Officer Lagud holding the sample container in one hand and Mr. Russell's penis in the other, and that when the container was full, Officer Lagud allowed Mr. Russell to finish urinating. Officer Carmody stated that when Mr. Russell was finished, Officer Lagud

"shook" Mr. Russell's penis and placed it back inside Mr. Russell's underwear.

Mr. Russell testified before the Board that during the collection of the urine sample, Officer Carmody stood behind him, and another officer touched his penis. He was unable to describe the appearance of the officer who took the sample, and upon cross-examination by Officer Lagud, Mr. Russell invoked the Fifth Amendment and refused to answer questions about his drug use and his ability to perceive on the night in question.

Officer Lagud denied that he had touched Mr. Russell's penis. He testified that he pulled down Mr. Russell's pants and underwear, placed the sample container in front of Mr. Russell's penis, and instructed him to urinate.

The Board did not accept Officer Lagud's account. Although Police Chief Easley had argued for termination, the Board ordered that the appropriate remedy was suspension without pay up to the date of the hearing, which effectively reinstated Officer Lagud.

Officer Lagud appealed to the Circuit Court of Jackson County, which overturned the Board's decision. The Board then appealed to this Court, which affirmed the decision of the Board. The case was transferred to the Supreme Court, which reversed, holding that Mr. Russell's testimony, which the Board initially considered, was inadmissible. The Supreme Court remanded the case so the Board could reweigh the evidence without Mr. Russell's testimony.

Upon remand, the Board conducted oral arguments, reviewed previous arguments of both parties, and considered the record without Mr. Russell's testimony. The Board again concluded that Officer Lagud had violated department policy and that suspension was the appropriate action.

The Board stated that it "considered testimony from police officers Lagud, Carmody, Crump, Bewick [a DRE officer], and Stewart [a DRE instructor] in making its findings. The Board also considered testimony from Sergeants Abraham, Hannan and Chief Easley." Officer Lagud appealed to the Circuit Court of Jackson County, which reversed the Board's decision, finding that the Board "singularly relied upon" Officer Carmody's testimony and that Officer Carmody's testimony was contradictory and did not provide substantial competent evidence to support the Board's ruling. This appeal followed.

### Standard of Review

In an appeal from an administrative action, we review the administrative agency's decision, not the decision of the circuit court. *TAP Pharm. Prods. Inc. v. State Bd. of Pharmacy*, 238 S.W.3d 140, 141 (Mo. banc 2007). Appellate review of an administrative decision is governed by Section 536.140.2, RSMo 2000, which authorizes a court to determine whether the action of an administrative agency:

(1) Is in violation of constitutional provisions;

(2) Is in excess of the statutory authority or jurisdiction of the agency;

(3) Is unsupported by competent and substantial evidence upon the whole record;

(4) Is, for any other reason, unauthorized by law;

(5) Is made upon unlawful procedure or without a fair trial;

(6) Is arbitrary, capricious or unreasonable;

(7) Involves an abuse of discretion.

If there is sufficient competent and substantial evidence to support the administrative agency's decision, the decision will be upheld. *White v. St. Louis Teachers*

*Union, Div. of Employment Sec.,* 217 S.W.3d 382, 388 (Mo.App. W.D.2007). In determining whether there is competent and substantial evidence to support a decision, a court must examine "whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222–23 (Mo. banc 2003). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id.* at 223.

In reviewing the Board's decision, we defer to the Board's determinations regarding "weight of the evidence and the credibility of witnesses." *White,* 217 S.W.3d at 388. In addition, if the Board "has reached one of two possible conclusions from the evidence, reviewing authority will not reach a contrary conclusion even if it could reasonably do so." *Id.*

### Analysis

■ Officer Lagud asserts that the Board erred in finding Police Chief Easley met his burden of proving the charges against him in that such a finding was not supported by competent and substantial evidence on the record as a whole. In his first point, Officer Lagud contends that the Board erred in relying solely on Officer Carmody's testimony. In his second point, he argues that the Board erred in dismissing other evidence that conflicted with Officer Carmody's testimony. We will address Officer Lagud's two points together.

Substantial evidence is defined as " 'evidence which has probative force on the issues, and from which the trier of facts can reasonably decide the case.' " *White,* 217 S.W.3d at 388 (quoting *Brown v. Div. of Employment Sec.,* 947 S.W.2d 448, 452 (Mo.App. W.D.1997)). In his testimony before the Board, Officer Carmody admitted that he did not actually see Officer Lagud reach into Mr. Russell's pants and take out his penis. However, he unequivocally stated that he did see Officer Lagud holding Mr. Russell's penis in one hand and the specimen cup in the other. Officer Carmody further testified that after Mr. Russell finished urinating, Office Lagud "shook" Mr. Russell's penis and placed it back inside Mr. Russell's underwear. The Board relied on this testimony in reaching its conclusion, stating in its Findings of Fact that "Carmody observed Lagud holding Russell's penis with Lagud's left hand and the specimen container in his right hand while Russell urinated into the specimen container." Officer Lagud points to Officer Carmody's prior written statement in arguing that Officer Carmody's testimony is contradictory and cannot qualify as substantial evidence.

■ While it is true that trial testimony that contradicts itself does not constitute substantial evidence, prior statements that are simply inconsistent with testimony at a hearing are to be taken into account by the fact-finder judging a witness's credibility. *Lagud v. Kansas City Bd. of Police Comm'rs,* 136 S.W.3d 786, 796 (Mo. banc 2004). Officer Carmody's internal written statement, the 191, was a prior statement written simply as an internal memorandum of the night's events and the procedures used. In his prior statement, Officer Carmody stated that "Lagud just unbuttoned and unzipped the subject's pants then removed his penis from his underwear." On cross-examination before the Board, however, Officer Carmody testified as follows:

Q: Did you tell investigator Dennis Coates that you observed Officer Lagud unzip and unbutton Mr. Russell's pants?

A: I don't know if I told him that. Apparently I assumed that that's how Mr. Russell's penis was extracted from his underwear.

Despite this inconsistency, in no way did Officer Carmody's testimony before the Board contradict itself. The only variation was between Officer Carmody's prior statement and his testimony before the Board. This inconsistency may affect Officer Carmody's credibility, but it does not affect whether his testimony constitutes substantial evidence. Furthermore, while Officer Carmody did concede that he assumed Officer Lagud reached into Mr. Russell's pants to remove his penis, Officer Carmody never wavered on what the Board found to be crucial evidence: that Officer Carmody saw Mr. Russell's penis in the hand of Officer Lagud. On direct examination before the Board, Officer Carmody testified as follows:

Q: Did you ever reposition yourself where you could see the front of Mr. Russell?

A: Yes, sir.

Q: And how did you do that?

A: Just simply I held onto the handcuffs or his hands in the handcuffs and just scooted around to the side.

Q: Okay. Did you then observe Mr. Russell's groin area?

A: Yes, I did.

Q: And did you observe anybody holding or touching Mr. Russell's penis?

A: Yes, I did.

Q: And who did you observe do that?

A: Officer Lagud had a hold of Mr. Russell's penis.

Despite this clear explanation, Officer Lagud argues the inconsistency between Officer Carmody's prior statement and his hearing testimony proves Officer Carmody's testimony is unreliable as probative evidence. It is within the Board's discretion, however, to believe or disbelieve the evidence before it. *White,* 217 S.W.3d at 388.

Officer Lagud asserts in his appellate brief that if Officer Carmody "had actually witnessed Officer Lagud touch Mr. Russell's penis, it seems likely that he would have either immediately stopped Officer Lagud or informed a supervisor. Instead, he never mentioned it to anyone until two days later." The hearing record reveals, however, that Officer Carmody's partner, Officer Crump, testified that he and Officer Carmody discussed the procedures used to obtain the urine sample the night of Mr. Russell's arrest. Officer Crump stated that "Officer Carmody commented to me the manner in which the urine specimen was collected along the lines that it was odd.... We collectively decided that, you know, perhaps that was maybe a process DRE or ASAP officers use that we just weren't familiar with." When asked what he understood that process to be, he stated that he understood Officer Lagud held Mr. Russell's penis while collecting the urine sample. He testified that Officer Carmody told him this the night Mr. Russell was arrested.

Officer Lagud also contends that the Board dismissed any evidence that contradicted the version of events testified to by Officer Carmody. This contention is meritless. The Board heard testimony from multiple law enforcement officers and was presented with two different accounts of what happened the night of Mr. Russell's arrest. The Board stated that it considered this testimony and reached a conclusion based on the evidence presented. "If evidence before an administrative body would warrant either of two opposed findings, we are bound by the administrative determination and it is irrelevant that there is evidence to support a contrary finding." *Cochran v. Bd. of Educ. of Mexico Sch. Dist. No. 59,* 815 S.W.2d 55, 59 (Mo.App. E.D.1991). There was evidence to support the Board's determination, and

as a result, we must uphold the Board's findings. *See Trusler v. Tate,* 941 S.W.2d 794, 797 (Mo.App. W.D.1997).

■ Officer Lagud also claims that Officer Hannan's findings were never challenged or disputed, and as such, her testimony cannot be disregarded. While it is true that unimpeached or undisputed evidence cannot be disregarded unless an administrative agency makes a specific finding that such evidence is incredible or unworthy of belief, *Stevinson v. Labor & Indus. Relations Comm'n of Mo., Div. of Employment Sec.,* 654 S.W.2d 373, 374–75 (Mo.App. S.D.1983), this rule is inapplicable here. Officer Hannan's testimony was disputed—by the testimony of Officer Carmody. Officer Lagud argues there was extensive testimony before the Board supporting his version of events but that the Board chose only to believe Officer Carmody's testimony. He cites *Yoos v. Jewish Hospital of St. Louis,* 645 S.W.2d 177, 185 (Mo.App. E.D.1982), which states that the contradictory testimony of a single witness does not qualify as substantial evidence. However, testimony is *not* contradictory if it is merely inconsistent with a previously written statement, as is the case here. *See Lagud,* 136 S.W.3d at 796.

■ A 2001 case before this Court provides guidance on this issue. In *Grace v. Mo. Gaming Comm'n,* 51 S.W.3d 891, 897–98 (Mo.App. W.D.2001), the appellant argued that the administrative agency's findings against him were unsupported by competent and substantial evidence. One of the appellant's employees provided the evidence against him. The appellant argued that the testimony was from a disgruntled employee and was thus so incredible that it could not be deemed substantial evidence. In that case, we found: "The [Commission] is entitled to weigh the credibility of testimony received and believe or disbelieve all or part of any witnesses'

testimony. Obviously, the Commission believed [the employee] and not [the appellant]. The Commission's finding ... is supported by competent and substantial evidence." *Id.* at 898 (quotations and citations omitted). Quite simply, if evidence before an administrative agency has any probative force on an issue and can aid the agency in deciding the case, it constitutes substantial evidence, and under the standard of review, we must uphold the agency's decision. *White,* 217 S.W.3d at 388.

Furthermore, Officer Lagud actually concedes that the Board did consider testimony other than that of Officer Carmody in making its determination. He argues, however, that the Board only relied on testimony other than that of Officer Carmody for non-crucial issues. He contends that on the issue of whether Officer Lagud held Mr. Russell's penis, the Board relied solely on Officer Carmody's testimony. Despite Officer Lagud's assertions, it is nevertheless within the Board's discretion to believe or disbelieve the evidence before it. *Id.* The Board chose to believe the testimony of Officer Carmody.

Officer Lagud contends that the Board's findings were insufficient in that they failed to identify specific evidence undermining Officer Lagud's version of events. This argument is disingenuous. In its findings, the Board stated that it considered testimony from numerous individuals in reaching its conclusion. The Board is not obligated to further defend its reasoning. Credibility of witnesses and the weighing of evidence are functions within the discretion of the Board, *id.,* and the Board exercised its discretion in finding Officer Carmody's testimony to be credible. Officer Carmody testified that he shifted his position to see what was occurring during the collection of the urine sample, and he stated that he saw Officer Lagud holding Mr. Russell's penis. Al-

though there was various testimony regarding the incident, the evidence conflicting with Officer Carmody's testimony was not so overwhelming as to render the Board's decision as erroneous. Furthermore, despite whatever inconsistencies Officer Lagud may argue, Officer Carmody's testimony had probative value and was evidence from which the Board could reach its conclusion. Thus, there was competent and substantial evidence to support the Board's decision.

While the dissent sets forth at great length and in painstaking detail the procedural and factual history of this case in support of its argument that the Board's ruling was against the weight of the evidence, many of the facts set forth by the dissent are not relevant to the issue before this court: whether, when weighing the evidence as a whole, substantial evidence was presented from which the Board could conclude that Officer Lagud held Mr. Russell's penis in his hand. Officer Carmody did assume Officer Lagud removed Mr. Russell's penis from his pants, but this was a logical assumption based on what Officer Carmody *did* see: Mr. Russell's penis in Officer Lagud's hand. Officer Carmody never wavered on this key point.

The decision of the Board is affirmed.

HARDWICK, J., Concurs.

ELLIS, J., Dissents in separate opinion.

JOSEPH M. ELLIS, Judge, dissenting.

I respectfully dissent from the majority's holding that the Board's decision is supported by competent and substantial evidence on the record as a whole and is not an abuse of discretion because I believe the Board's ruling was against the overwhelming weight of the evidence. *See White v. St. Louis Teachers Union,* 217 S.W.3d 382, 388 (Mo.App. W.D.2007) ("An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." (internal quotations omitted)).

Officer Lagud's two points on appeal both generally assert that the Board's decision was not supported by competent and substantial evidence. Accordingly, I set forth the factual and procedural background in detail.

On the night of September 10, 2000, Officer James Carmody and his partner, Officer Crump, came upon James Russell in the parking lot of a Kansas City nightclub. He was sitting behind the steering wheel of his car, apparently unconscious, with his arm and leg hanging out of the open door, the keys in the ignition, and the engine running. The officers woke up Mr. Russell and asked him to exit the vehicle for a field sobriety test, which he was unable to perform, so they arrested him for driving under the influence. While waiting for a transport wagon to arrive, the officers conducted a search and found some drugs on Mr. Russell's person and numerous drugs in his vehicle.

Mr. Russell was transported to the police station, and the officers obtained the assistance of Officer Lagud and Officer Bewick, both drug recognition and evaluation ("DRE") officers, to conduct a series of tests. Mr. Russell was a six-foot, 240–pound bodybuilder, so the officers kept his hands handcuffed behind his back as a safety precaution due to his erratic behavior, which alternated between unconsciousness and agitation. A breathalyzer test failed to indicate the presence of alcohol, and Mr. Russell consented to a urine test. Officers Lagud and Carmody then escorted Mr. Russell to a small, partially enclosed toilet in the holding cell. The stall was about three feet across, with about a foot between the toilet and the privacy wall, so there was very little room for

anyone to stand. Officer Carmody stood behind Mr. Russell and held on to his handcuffed hands to stabilize and prevent him from falling, and Officer Lagud stood to the right of Mr. Russell. Officers Carmody and Lagud have differing accounts as to what occurred next.

According to Officer Lagud, he was standing to the right of Mr. Russell outside the privacy wall and Officer Carmody was standing behind and to the left of Mr. Russell. Officer Lagud held the specimen cup in his left hand while, using his right hand, he unbuttoned and unzipped Mr. Russell's pants, grasped the pants at Mr. Russell's right hip and pulled them partially down, then grasped the underwear at the same place and pulled them down to expose Mr. Russell's penis. He then switched the specimen cup to his right hand, instructed Mr. Russell to begin urinating, and leaned over the privacy wall to collect the sample. Once the sample had been obtained, Officer Lagud turned and placed the cap on the cup while he waited for Mr. Russell to finish urinating. After Mr. Russell had finished, Officer Lagud grasped the right side of his underwear and pulled them back up. He then pulled up Mr. Russell's pants and left him with Officer Carmody. Officer Lagud maintained that he never touched Mr. Russell's penis during this process.

A few days later, Officer Carmody informally discussed the events of that night with his supervisor, Sergeant Abraham, while they were lifting weights at the station. Officer Carmody stated that Officer Lagud had unzipped Mr. Russell's pants and pulled out Mr. Russell's penis with his hand, held the penis while Mr. Russell was urinating into the specimen cup, then shook the penis and pushed it back into Mr. Russell's pants. Sgt. Abraham directed Officer Carmody to complete an internal statement, or "191." Officer Carmody

did so on September 14, 2000, stating as follows:

> Upon the request of a urine test Crump stood the subject up and began to remove the handcuffs at which time Lagud told Crump to "leave the cuffs on." Lagud then escorted the subject into a holding cell and asked me to follow. Once at the toilet in the holding cell I stood behind the subject expecting Lagud to tell me when he was ready for me to remove the handcuffs, however Lagud just unbuttoned and unzipped the subject's pants then removed his penis from his underwear and instructed him to begin urinating into a specimen container being held in Lagud's free hand. When the subject had filled the container Lagud aimed the subject's penis into the toilet allowing him to continue urinating before returning the subject's penis back into his underwear and asking me to re-zip and re-button the subject's pants while he secures the collected sample.

Based on that statement, Sgt. Abraham forwarded the matter to Sergeant Hannan, who was Officer Lagud's supervisor, to determine whether such actions were appropriate.

Sgt. Hannan spoke with other DRE officers and determined that it was not normal procedure to touch an arrestee's penis under such circumstances. She also contacted the Detention Unit, where Officer Lagud had worked prior to being transferred to the DUI section a few months earlier, to determine what their "procedure is when a volatile restrained inmate has to urinate." She was informed that the procedure is to "take the inmate to the toilet stool and pull their pants down and let the inmate attempt to hit the toilet" but that they do not hold the inmate's penis at any time. Captain Galvin later noted in his disciplinary recommendation that

"[t]his same procedure would allow a urine specimen to be obtained without physical contact with an arrest[ee']s genitalia."

On September 15, 2000, Sgt. Hannan met with Officer Lagud and advised him of the allegations against him, told him that it was very important that he be honest with her, and told him that such actions were inappropriate for a police officer. She initially believed Officer Carmody's version of the events, as relayed by Sgt. Abraham. Sgt. Hannan asked Officer Lagud what had happened that night, and "he immediately said, 'I did not touch that man's penis, I did not touch him anywhere down there'" and proceeded to tell her what occurred as stated above. Officer Lagud then completed a 191, which was consistent with their conversation.

Sgt. Hannan conducted a preliminary reenactment of the events based on Officer Lagud's statement. She examined the toilet in the holding cell at issue and took pictures of officers posed in the positions stated by Officer Lagud. Based on the "extreme differences" in the versions of events presented by the two officers, Sgt. Hannan initially recommended that the officers be given polygraph examinations. She was told that no polygraphs would be given, so she recommended that an internal investigation be initiated.

An internal investigation ensued, and a detective interviewed Officers Carmody and Lagud, as well as Mr. Russell, over the next several months. Officer Lagud answered all questions consistently with his conversation with Sgt. Hannan and with his 191, and he maintained that he never touched Mr. Russell's penis at any time that night.

Officer Carmody also answered questions consistently with his 191. In pertinent part, he told the investigator that he "ha[d] a full view of Mr. Russell's groin region as Officer Lagud began opening Mr. Russell's pants." When asked to "[d]escribe how Officer Lagud pulled down his pants," he responded, "Well, he actually just unbuttoned and unzipped them. Then he opened the zipper and reached in the waistband of the underwear." Although Officer Carmody's answers in full are not in the record, these responses were read into evidence at trial. Sgt. Hannan's report, *see infra*, also indicates that Officer Carmody stated that he was standing behind and slightly to the right of Mr. Russell and that Officer Lagud was standing in front of and to the right of Mr. Russell inside the privacy wall.

Mr. Russell did not complain while the urine sample was being collected or at any time afterwards, but he agreed to give a statement in the internal investigation. Mr. Russell's interview responses are also not in the record, and his testimony at the hearing was stricken. However, the record reflects that, before giving his statement, Mr. Russell was told that he was being interviewed "because there was a complaint that an officer had inappropriately touched his penis during the drug urine screen sample." Sgt. Hannan's final report indicates that Mr. Russell told the interviewer that Officer Carmody was standing directly behind or to the right of him and that Officer Lagud was standing to the right of him inside the privacy wall. The report further notes that Mr. Russell said he "believed Officer Lagud handled his penis when taking it out and putting it back in his jeans. He did not recall if Officer Lagud held his penis while he urinated.... [H]e did not believe Officer Lagud shook or manipulated his penis after he completed urinating." The report notes that Mr. Russell "did remember" being handcuffed and that Officer Lagud wore rubber gloves.

After the internal investigation had been completed, Sgt. Hannan reviewed the file,

including the statements of both officers and Mr. Russell, and conducted another reenactment of the events. She did so in order to evaluate Officer Carmody's ability to actually see what occurred, in part because Officer Carmody had stated that the officers were in different positions than Officer Lagud had described. Sgt. Hannan is trained in accident reconstruction. She was not aware of any other person having conducted a reenactment or gone to the holding cell to evaluate the statements of the officers, and no such evidence appears in the record.

In her January 5, 2001 final report, Sgt. Hannan concluded that "[n]o matter which position the officers were in, I was not convinced that Officer Carmody would have had a 'full view of Mr. Russell's groin area' as he stated in his statement." She had officers assist her in staging positions at the same toilet, and she stood behind in the same positions as reported by both officers. She "determined that in neither position did I have a view of the subject's groin area. I found that the only way that I would be able to observe the subject's groin area was if I would lean over from the side." Sgt. Hannan further explained at the hearing that Officer Carmody would have had to lean over "[f]rom the opposite side that he said he was standing" to be able to observe Mr. Russell's groin area. Officer Carmody said in his statement that he was standing on the same side as Officer Lagud, and Sgt. Hannan concluded that Officer Lagud would have blocked his view while leaning over the wall to collect the urine sample. She further stated in her report that it was almost impossible to see Mr. Russell's groin area if Officer Lagud had been inside the privacy wall because he would have been in the way.

Based on her reenactment and the differences in the description of the events by Mr. Russell and the officers, Sgt. Hannan concluded:

> Although it appears that Mr. Russell gave some credence to Officer Carmody's allegation, because of his impairment at the time of arrest as reported by the officers and his impairment as described later on that same day in an Investigative Report ... where he was apparently incoherent, hallucinating and in a drug-induced psychosis, I am still not confident that Officer Lagud was deceptive. *Although I do not know Officer Carmody, I believe it is possible that he did not actually see Officer Lagud handle Mr. Russell's penis and that he* <u>*assumed*</u> *that is what Officer Lagud did.* I believed this issue could have been resolved by giving both Officer Carmody and Officer Lagud a polygraph examination, but I was advised that a request for polygraphs was denied. Because of my doubt as to Officer Lagud's guilt in this matter and my request for polygraph examinations being denied, I have no other choice but to recommend no further action.

(Emphasis added.) At the hearing, Sgt. Hannan confirmed that she believed that Officer Lagud did not lie and that he did not touch Mr. Russell's penis, and she also believed that Officer Carmody "believed that it happened, even though I don't believe he saw it."

Based on the internal investigation and Sgt. Hannan's report, Captain Galvin concluded that Officer Lagud's statements were deceptive and recommended a seven-day suspension. He stated that he believed the allegation that Officer Lagud "physically mishandled an arrest is confirmed by the witness officer and arrest[ee] providing statements that are basically the same." Captain Galvin noted that Sgt. Hannan was "concerned that there is the possibility that Officer Carmo-

dy didn't actually witness Officer Lagud's actions." However, he relied on the facts that "Officer Carmody is emphatic that he observed Officer Lagud's actions" and Mr. Russell "confirms Officer Carmody's statements" even though "he made no complaint and had nothing to gain by providing his statement."

After reviewing the internal investigation file and the recommendations from Sgt. Hannan, Captain Galvin, and others in the chain of command, then-Chief of Police Easley submitted charges to the Board requesting the termination of Officer Lagud. Officer Lagud was charged with misconduct for violating department policy by obtaining a urine sample by grabbing and holding the penis of an arrestee and then denying that he had done so. Chief Easley based the charges on Officer Carmody's statement that he saw Officer Lagud touch Mr. Russell's penis and on Mr. Russell's statement and the fact that "both Mr. Russell and Officer Carmody basically said the same thing."

Both officers were eventually given polygraph examinations. An examiner with the police department conducted Officer Carmody's examination on March 27, 2001, and the examiner opined that Officer Carmody was not deceptive in his responses. The examiner explained that a polygraph tests what someone believes or what he believes he saw, so if Officer Carmody "absolutely believes that he saw Officer Lagud holding or touching Mr. Russell's penis then he would pass, relatively speaking," even if his belief was inaccurate. The examiner stated that Officer Carmody told him that he "did not stand there and stare" but "simply looked around" for "a very brief look" when he heard Officer Lagud tell Mr. Russell to start urinating and didn't understand how that could happen when both hands were still in handcuffs. He did not recall Officer Carmody

stating that he saw Officer Lagud take Mr. Russell's penis out of his underwear, and Officer Carmody did not tell him that he saw Officer Lagud shake or manipulate his penis even though he asked those questions.

Officer Lagud's polygraph examination was conducted by an independent examiner on March 15, 2001, and the examiner opined that Officer Lagud was truthful and was not deceptive throughout the testing process, including when he stated that he did not touch Mr. Russell's penis on September 10, 2000. The examiner also reviewed the results from Officer Carmody's polygraph, and he opined that Officer Carmody was deceptive as to the questions of whether he "[saw] Officer Lagud hold Mr. Russell's penis during the collection of that urine sample." He stated that the polygraph examiner who administered the test to Officer Carmody was "very qualified" but that they had been trained under different methodologies and he simply had a different opinion as to the results of the test.

At the hearing before the Board, Officer Lagud testified consistently with his prior statements as described above. He further testified that, in his opinion, Officer Carmody could not have been able to see over Mr. Russell's shoulder because the men are about the same height and Officer Carmody would not have been able to see over Mr. Russell's stomach even if he stood on his tiptoes. Officer Lagud admitted that he was facing down when he was working with the zipper and button, so he could not see whether Officer Carmody was looking around or over Mr. Russell's shoulder.

Officer Carmody testified at the hearing that he "did not actually see" Officer Lagud unzip Mr. Russell's pants, reach into his underwear, and remove his penis even though he stated that he had in his 191

and to the internal investigator. He stated, "Apparently I assumed that's how Mr. Russell's penis was extracted from his underwear." Officer Carmody testified that he was "somewhat dumbfounded" when Officer Lagud instructed Mr. Russell to start urinating, so he "scooted around to the side" to position himself so he could see while still holding onto his hands in the handcuffs. He insisted that he saw Officer Lagud hold Mr. Russell's penis in his left hand, hold the cup in his right hand while Mr. Russell urinated into the cup, then shake Mr. Russell's penis a few times and place it back into his underwear. He stated that Officer Lagud placed the cap on the urine sample after he placed Mr. Russell's penis back into his underwear.

Officer Carmody agreed that Mr. Russell "had a belly" and "was good sized" but stated that he was able to see Mr. Russell's groin area despite Mr. Russell's size and the fact that he was standing behind and to the right of Mr. Russell. He could not recall whether he was looking over Mr. Russell's shoulder or around his side, but he maintained that he looked around to the right, on the same side as Officer Lagud. He testified that he remained in that position throughout the urinating process but that he could not recall whether it was awkward or uncomfortable. Officer Carmody further stated that Officer Lagud "bent over . . . next to th[e] toilet" but did not crouch to collect the sample. He stated that he could not see Mr. Russell's "entire penis" but that he could see Officer Lagud's hand on the penis and the "portion of the penis which was urinating." Officer Carmody did not notice whether Mr. Russell was circumcised because he "didn't pay that much attention to it."

Officer Carmody also testified as to events prior to the collection of the urine sample. He stated that, when he and his partner woke up Mr. Russell and had him exit the vehicle, Mr. Russell "stood up" and exited the vehicle of his own volition. He claimed that he "helped [Mr. Russell] out" by holding on to his arm and that his "knees buckled" but "[h]e never actually hit the ground." However, he admitted that the DUI sheet, which lists the initial contact with Mr. Russell and was completed on September 10, 2000, shortly after the incident, indicates that Mr. Russell "fell to the ground" as he exited the vehicle. Officer Carmody also stated that he "assum[ed]" Officer Lagud completed the DUI sheet until he was reminded that the sheet was signed by his partner, Officer Crump. Officer Crump later testified that he believed Mr. Russell exited the vehicle by falling out of it, which is what he indicated on the DUI sheet, and that Mr. Russell was unconscious, basically incoherent, and apparently intoxicated at the time.

Officer Carmody also testified as to how Mr. Russell exited the transport vehicle at the police department on that night. He stated that he did not recall the incident but that he "believe[d] he was assisted out of the wagon." He further stated that he "imagine[d] it would have been the wagon driver, and if he needed help I would have helped him." However, he admitted that he stated in his deposition that he and his partner assisted Mr. Russell out of the wagon, stating, "My partner and I were on either side of him and just escorted him in the DUI room." Officer Crump was not questioned about this aspect of the night.

Officer Carmody stated that he told Officer Crump about the collection of the urine sample when they left in their patrol car after paperwork had been completed and Mr. Russell had been transported to the hospital for treatment. Officer Crump testified that Officer Carmody "commented to me the manner in which the urine specimen was collected along the lines that it was odd I guess is the word. We collec-

tively decided that, you know, perhaps that was maybe a process DRE ... officers use that we just weren't familiar with." He stated that Officer Carmody told him that "Officer Lagud had held Mr. Russell's penis while he got the urine sample."

Officer Bewick, the other DRE officer who assisted with the evaluations prior to the urine sample collection, was asked if he had an opinion as to whether Officer Carmody would have been able to see around Mr. Russell to observe Officer Lagud allegedly holding his penis. He responded, "I don't see how in the world anybody could see around [Mr. Russell]. The young man was in here this morning, he's got a broad set of shoulders, he's a big boy."

The Board concluded that Chief Easley had met his burden to show that Officer Lagud had violated department policy and that the appropriate remedy was suspension without pay for nearly eight months, effectively reinstating him.

Officer Lagud filed a petition for judicial review in the circuit court, which overturned the Board's decision, and the Board appealed. The Supreme Court held that the Board erred in failing to strike Mr. Russell's testimony "because his invocation of the Fifth–Amendment on cross-examination improperly precluded Officer Lagud from testing his capacity to perceive and recall what occurred during the collection of the sample." *Lagud,* 136 S.W.3d at 788. The Court found that the failure to strike was prejudicial because "the Board relied primarily on the testimony of Mr. Russell and Officer Carmody in reaching its decision." *Id.* Accordingly, the Court remanded the case to give the Board "the opportunity to consider Officer Carmody's remarks and the credibility or lack of credibility that they should be given absent the corroborative effect of Mr. Russell's testimony." *Id.* at 796. Because the Board

had not had that opportunity, the Court declined to address Officer Lagud's additional claim that Officer Carmody's testimony "was so inherently contradictory as to be insufficient to support a finding" against him. *Id.*

Upon remand, the Board conducted oral arguments, reviewed previous arguments of both parties, and considered the record without Mr. Russell's testimony. The Board again concluded that Officer Lagud had violated departmental policy and that suspension was the appropriate action. The Board stated that it "considered testimony from police officers Lagud, Carmody, Crump, Bewick, and Stewart [a DRE instructor] in making its findings. The Board also considered testimony from Sergeants Abraham, Hannan, and Chief Easley.... The Board did not rely on any testimony of Russell, any re-enactment or on any polygraph examination in connection with its decision." The Board found that "Carmody observed Lagud holding Russell's penis with Lagud's left hand and the specimen container in his right hand while Russell urinated in the specimen container.... Lagud removed Russell's penis from his pants, obtained the urine sample, and pulled Russell's underwear back over Russell's pants."

Officer Lagud filed a petition for judicial review, and the circuit court reversed the Board's decision because it was not based on substantial and competent evidence after a review of the entire record. The court found that the Board had "singularly relied upon" Officer Carmody's testimony, which was "so riddled with inconsistencies that it lack[ed] substantial probative value." The court noted that Officer Carmody "changed his version of the events" at the hearing and found that Officer Carmody had "admittedly, either purposely or mistakenly, misled his Sergeant and the Department as to what he actually ob-

served on September 10, 2000." The court also stated that it found Sgt. Hannan's conclusions "compelling," noting that she was trained in accident reconstruction, and that her reenactment further undermined Officer Carmody's testimony. This appeal follows.

As noted *supra*, Officer Lagud's two points of error are closely related; he asserts in both that the Board erred in finding that Chief Easley met his burden of proving the charges because such a finding was not supported by competent and substantial evidence on the record as a whole. In his first point, Officer Lagud contends that the Board erred in relying solely on Officer Carmody's testimony. He argues at the end of his first point and in his second point that the Board erred in summarily dismissing other evidence that undermined Officer Carmody's testimony. As in the majority opinion, I will address the two points together.

I believe that a review of the whole record reveals that the Board's ruling was against the overwhelming weight of the evidence and, therefore, is not supported by competent and substantial evidence. *White*, 217 S.W.3d at 388. Officer Lagud consistently testified that he never touched Mr. Russell's penis, his version of how he collected the sample was consistent with how it was normally done in the Detention Unit where he was previously assigned, and Captain Galvin expressly stated that it was possible to collect a sample in that manner without touching the arrestee's penis. The Board chose to believe Officer Carmody's testimony that he saw Officer Lagud touch Mr. Russell's penis even though it directly contradicted the opinions of Sgt. Hannan and Officer Bewick, who had no personal interest in the case, based on the same physical evidence. Indeed, the Board even chose to believe Officer Carmody's testimony that Officer Lagud removed Mr. Russell's penis from his pants even though he expressly stated that he did not actually see that happen and only assumed it had occurred.

As noted above, Sgt. Hannan concluded, based on her reenactment of the relative positions as stated by both officers and by Mr. Russell, that Officer Carmody would not have been able to see around Mr. Russell by leaning to the same side as Officer Lagud. Officers Bewick and Lagud both testified that they did not believe Officer Carmody would have been able to see around Mr. Russell because of their relative sizes. Officer Carmody agreed with the dimensions of the partially enclosed toilet area, consistently stated that he looked around Mr. Russell on the same side as Officer Lagud was standing, and agreed that Mr. Russell was a big man and had a sizeable stomach, but he nevertheless claimed that he was able to see around Mr. Russell and saw Officer Lagud touch his penis. Officer Carmody did not dispute any of the physical facts as testified to by Sgt. Hannan, Officer Bewick, or Officer Lagud, and his testimony that he could see around Mr. Russell was clearly opposed to those physical facts. I disagree with the majority's statement that "the evidence conflicting with Officer Carmody's testimony was not so overwhelming as to render the Board's decision as erroneous." *Maj.* at 293.

Moreover, as Officer Lagud argues under his second point, the Board did not explain why it gave no weight to Sgt. Hannan's conclusions, even though there had been no challenges to her qualifications or methodology. "[A]dministrative agencies may not arbitrarily ignore the testimony of an uncontradicted witness, unless the agency makes a specific finding that the evidence is not credible." *Carron v. Ste. Genevieve Sch. Dist.*, 800 S.W.2d 64,

68 (Mo.App. E.D.1990)[1] (citing *Stevinson v. Labor & Indus. Relations Comm'n of Mo.*, 654 S.W.2d 373, 374–75 (Mo.App. 1983)); *see also Copeland v. Thurman Stout, Inc.*, 204 S.W.3d 737, 743 (Mo.App. S.D.2006). The majority asserts that Sgt. Hannan's testimony was disputed by Officer Carmody, *Maj.* at 291–92, but, as noted *supra,* Officer Carmody did not dispute the factual evidence on which her conclusions were based. That evidence was corroborated by testimony from Officers Lagud and Bewick, and Officer Carmody did not offer any contradictory evidence.

The Board's reliance on Officer Carmody's testimony and refusal to rely on Sgt. Hannan's reenactment or the polygraph examinations is especially troubling because Officer Carmody's memory of other events of the night contrasted with the police records and he also admitted that he "assumed" several other facts concerning the night of the arrest. This is consistent with Sgt. Hannan's conclusion that she believed Officer Carmody "assumed" that he saw Officer Lagud handle Mr. Russell's penis but did not actually see it. It is also consistent with the polygraph examiner's testimony that Officer Carmody would have passed the examination even if he *inaccurately* believed that something had occurred. Moreover, the polygraph examiner stated that Officer Carmody told him he only looked around Mr. Russell very briefly and that, even though he asked about it, Officer Carmody did not say that he saw Officer Lagud take Mr. Russell's penis out of his pants or shake it and put it back in the pants.

1. Overruled on other grounds by *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220 (Mo. banc 2003).

2. Officer Lagud prays that we restore him to the status quo before the charges were levied, including reinstating him and awarding back pay and benefits, removing all allegations from his file, and awarding attorney fees,

In conclusion, after a comprehensive, thorough review of the whole record, I can only conclude that the Board's decision is against the overwhelming weight of the evidence and is, therefore, "not supported by competent and substantial evidence." *White,* 217 S.W.3d at 388. Accordingly, I would reverse the Board's decision and remand the case to the trial court with directions to remand the case to the Board for further proceedings.[2]

among other things. If the case were reversed, Officer Lagud might well be entitled to such relief *in toto.* But we do not have a sufficient record before us to make those decisions, so I would remand the case for further proceedings not inconsistent with this opinion.