Brian K. HAMM, Appellant,

v.

**POPLAR BLUFF R–1 SCHOOL DISTRICT, Respondent.**

No. 21584.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 6, 1997.

28

Daniel T. Moore, L. Joe Scott, Daniel T. Moore, Poplar Bluff, for appellant.

Clinton D. Summers, Summers, Walsh, Pritchett & Blaich, P.C., Poplar Bluff, for respondent.

PARRISH, Presiding Judge.

This is an appeal of the termination of a probationary teacher's contract by Poplar Bluff R–1 School District. The district terminated Brian K. Hamm's contract for immoral conduct following a hearing before the school board. This court affirms.

The circumstances that resulted in termination of Mr. Hamm's contract arose during the late evening hours of August 15, 1996, and early morning hours of August 16, 1996. Shortly before midnight the evening of August 15, the Poplar Bluff Police Department received a call from a private detective concerning the whereabouts of S.L., a fourteen-year-old girl. The private detective had been hired by S.L.'s father.

Two police officers, Lt. Tommy D. Brown and Sgt. Edgar Mobley, went to Mr. Hamm's residence. They decided to contact Mr. Hamm and inquire about the girl's presence; if Mr. Hamm denied she was at his residence they "would just pull back and watch the residence."

The officers arrived at Mr. Hamm's residence about 12:10 a.m. There were no lights on in the Hamm residence. The officers observed no movement in the house. They knocked on the door. After a short time, a man appeared at the door and identified himself as Brian Hamm. The officers asked if S.L. was there. Mr. Hamm said she was not. They asked if he had any contact with her.

He told the officers he had talked to her on the telephone about 30 minutes earlier.

The officers asked Mr. Hamm if they could enter his residence and look around. Mr. Hamm inquired whether they had a search warrant. When the officers told him they did not have a search warrant, he said they did not need to come in. Lt. Brown told Mr. Hamm if he had any contact with S.L. to tell her she should go home, that her parents were worried about her.

Lt. Brown and Sgt. Mobley left. Sgt. Mobley went to a location where he could observe the front of Mr. Hamm's residence. Lt. Brown started to go behind the building. Before Lt. Brown reached his destination behind the building, Sgt. Mobley called him on the radio and reported seeing a girl leave the Hamm residence.

Sgt. Mobley explained:

I got out of my patrol car and I went up and I was standing behind by a residence across the street watching the front of Mr. Hamm's residence. About less than five minutes later I observed a white female come running out of his residence across the street, down. She went across the street and behind a house and into the alley where I was at and where I caught the girl. It turned out to be [S.L.].

Sgt. Mobley took S.L. into custody. He and Lt. Moore returned to Mr. Hamm's residence.

Lt. Moore was asked if he had any further conversation with Mr. Hamm. He answered, "Yes; I did." He was asked the following questions and gave the following answers.

Q. [by the attorney for the school board] What was the nature of that conversation?

A. We were there to arrest him.

Q. Did he say anything to you?

A. Yes; he did.

Q. What did he say?

A. He asked if he could put on a pair of—he had a pair of boxer shorts or he had on some shorts and he wanted to know if he could put on a pair of pants.

Q. Did you allow him to do that?

A. Sure, we did. The only stipulation was I have to accompany you into the house and he said well, he said to me he said I've been trying to get rid of her, what was I supposed to do. Then he said I guess I should have told you that she was here in the first place. . . .

At the conclusion of the hearing, the school board entered written findings of fact and conclusions of law. The board concluded:

Based upon a preponderance of the evidence presented at the hearing, Mr. Hamm is found to have had a fourteen year old female student at his apartment at approximately 12:25 A.M. on August 16, 1996, without the permission of the child's parents and further that he told the investigating officers who came to his apartment looking for said child that she was not there, when in fact she was. These facts constitute immoral conduct.

Brian Hamm's contract with the district was for employment as a teacher "during the 1996–97 school year for a term of 185 days commencing on August 19, 1996." Mr. Hamm had been employed by the district as a teacher the previous year. He was a probationary teacher in that he had been employed in the district for less than five years. *See* § 168.104(5).[1] The contract provided:

This contract may be terminated during its term for incompetency, inefficiency or insubordination in the line of duty in the manner provided by law, and may be terminated after notice and a hearing for other good cause, including but not limited to any material breach or any cause stated by law for the termination of permanent or probationary teachers.

Section 168.114 states the causes for which an indefinite contract with a permanent teacher may be terminated.[2] One of those causes is immoral conduct. § 168.114.1(2).

Brian Hamm presents one point on appeal. He contends the school board erred in terminating his contract "because the decision was not supported by evidence and law in that the evidence adduced at the board's hearing did not establish that [he] had engaged in immoral conduct or conduct which would render him unfit to teach." He argues that evidence that he refused to allow police into his home without a search warrant and that a fourteen-year-old girl was in his residence around midnight was not sufficient evidence to support the district's action terminating his contract.

 Although Mr. Hamm was not a permanent teacher, notice and a hearing were required in order for him to be dismissed. *Valter v. Orchard Farm School Dist.*, 541 S.W.2d 550, 556 (Mo.1976). The district elected to follow the procedures prescribed by § 168.116 for termination of an indefinite contract of a permanent teacher. Use of the procedure with respect to termination of a probationary teacher's contract that is prescribed for termination of a permanent teacher's contract was approved in *C.F.S. v. Mahan*, 934 S.W.2d 615, 618 (Mo.App.1996). *C.F.S.* also explains the scope of appellate review in such cases:

When reviewing an administrative decision the question is whether the board or tribunal acted within its authority and reached a conclusion supported by evidence and law. A court does not substitute its judgment for the judgment of an administrative agency acting within its powers.

*Id.* at 619.

 Just as teacher licensure laws are in place to serve and protect students of the communities in which teachers are employed, *see Howard v. Missouri State Bd. of Educ.*, 913 S.W.2d 887, 893 (Mo.App.1995), so are the provisions of law that enable school districts to terminate teacher's contracts for conduct that endangers the welfare of students. "The paramount interest is the welfare of the students, and the authority of the Board should not be confined to such an extent that there may be no remedy for a

---

1. References to statutes are to RSMo 1994.

2. A permanent teacher is one who is employed by a district and has previously been so employed for five successive years. § 168.104(4). An indefinite contract is a contract for an indefi-

nite period entered into between a school district and a permanent teacher. § 168.104(3). An indefinite contract terminates only as provided in § 168.106.

situation having serious negative potential."
*C.F.S. v. Mahan, supra.*

■ The district, through its board of directors, could have concluded that Mr. Hamm's actions the evening and early morning of August 15–16 demonstrated an unsuitability to serve as a teacher and coach in the school system—his contract provided for extra duties as an eighth grade basketball coach.

■ Immoral conduct has been held to be conduct that renders a teacher unfit for the performance of his duties; conduct rendering a teacher unfit to teach. *See Ross v. Robb,* 662 S.W.2d 257, 259 (Mo. banc 1983). The school board could have concluded that Mr. Hamm's actions in hiding the presence of a fourteen-year-old girl in a darkened residence in the late evening—early morning hours, and in denying her presence when confronted by police, did not demonstrate the morals required of a person employed to teach and coach children of the same approximate age. The board had reason to question the teacher's motives in view of his dress when confronted by police.

■ "Good moral character is generally defined as honesty, fairness, and respect for the rights of others and for the laws of the state and nation." *Hernandez v. State Bd. of Registration for Healing Arts,* 936 S.W.2d 894, 899 n. 1 (Mo.App.1997). The school board, in its review of Mr. Hamm's actions, was faced with circumstances in which the teacher was dishonest in his response to police officers and in which he disregarded the rights of the child's parents to prescribe rules for her behavior.

Mr. Hamm's conduct and poor judgment were such that the school board could have concern, which would not have been unreasonable, about the possibility of similar future conduct with other students. That determination was one for the school board to make. The school board acted within its authority in reaching its decision. The decision was supported by the evidence. The district's action in terminating Mr. Hamm's contract is affirmed.

SHRUM and BARNEY, JJ., concur.