**Lynda HOMA, Appellant,**

v.

**CARTHAGE R–IX SCHOOL DISTRICT, Respondent.**

**No. SD 30502.**

Missouri Court of Appeals, Southern District, Division Two.

May 4, 2011.

Application for Transfer Denied May 26, 2011.

Application for Transfer Denied June 28, 2011.

Richard L. Schnake, Springfield, MO, for Appellant.

Thomas A. Mickes, St. Louis, MO, for Respondent.

WILLIAM W. FRANCIS, JR., Judge.

Lynda Homa ("Appellant") appeals a judgment confirming the decision of the Carthage R–IX School District Board of Education ("Board") terminating her employment with Carthage R–IX School District ("District") based on immoral conduct. We affirm the judgment of the trial court.

### Facts and Procedural History

The District is a Missouri public school district and a political subdivision of the State of Missouri. Appellant was employed as a tenured teacher in the Dis-

trict, pursuant to section 168.104,[1] serving as the director of the Parents as Teachers ("PAT") program for twenty years. As director of the PAT program, one of Appellant's responsibilities was the supervision of PAT employees, including evaluating and disciplining the program's employees.[2]

The PAT program is a free, voluntary parent education program offered by the District for all parents who have children from pre-birth through kindergarten "to nurture and help families." The program is designed to help increase parent confidence, give parents an understanding of their child's developmental progress, and to provide children with early developmental screening. In Missouri, PAT is funded by the Missouri Department of Elementary and Secondary Education ("DESE"). DESE requires that each district maintain specific records of program activities. The DESE's Early Childhood Development Act (Senate Bill 658) ("ECDA") *Program Guidelines and Administrative Manual* (2006) ("the ECDA Guidelines"), provides "parent educators must keep educational records of each personal visit and group meeting. Records must include ... the content of the visit [and] outline issues raised by the parents.... **Only visits that have a completed personal visit record will be counted for reimbursement.**"

ECDA Guidelines, "Parent Education" at 21 (emphasis in original).

Parent educators make personal visits, conduct group meetings, offer resources, and provide developmental screening for children. The ECDA guidelines provide for personal visits by PAT educators and state the goal is for "the child to be present during the personal visit. There may be instances where this is not possible.... These special incidences must be approved by DESE."[3] ECDA Guidelines, "Personal visits" at 14. While parent educators working with families through the PAT program are expected to build a relationship of trust and offer empathy for their client families, parent educators "are not expected to serve in the role of a counselor or social work[er]." It is important for the "parent educator to be clear about appropriate professional and personal boundaries" with their clients.[4]

In September 2007, PAT employee and parent educator, Laura Davenport ("Davenport"), asked Appellant if she could visit Encarnacion Bail ("Bail"),[5] a former participant in the District's PAT program who was incarcerated in the St. Clair County Jail (the "jail") in Osceola, Missouri. Bail was a Guatemalan woman being held in jail pending her deportation due to her undocumented immigrant status. At that time,

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

2. PAT's *Supervisor's Manual and Program Administration Guide, Born to Learn*™ *Components: Ethical [C]onsiderations for [P]arent [E]ducators* (2005) provides:

 When the relationship with the family becomes more complex, the supervisor's role is to support the parent educator in maintaining a clear sense of the appropriate roles to play and how to guide the family toward obtaining the other resources they need in the most comfortable way for all involved.

*Id.* at 264.

3. The DESE recordkeeping training presentation for PAT educators, also provides: "**Special Note:** The child must be present during the personal visit."

4. PAT's *Supervisor's Manual and Program Administration Guide, Born to Learn*™ *Components: Ethical [C]onsiderations for [P]arent [E]ducators* at 259, 260 (2005).

5. "Encarnacion Bail" is Bail's legal name; she was incarcerated in the St. Clair County Jail under the alias "Encarnacion Angelica Alvardo."

Bail had an eleven-month-old child, C.B., who was staying with family members in Carthage. Appellant authorized Davenport's visit to the jail, but informed Davenport she would only pay one-half of the mileage for her trip. Appellant did not notify her supervisor or call DESE to get approval before allowing Davenport to make a visit to the jail when she knew C.B. would not be present.

After Davenport returned from the jail, she informed Appellant she had a conversation with Bail about giving C.B. up for adoption. Appellant did not require Davenport to complete a personal visit record for her trip to the jail. Appellant authorized payment for 165 miles[6] and Davenport's full salary for that day. As no personal visit record was completed for this trip, the money expended for Davenport's visit to the jail could not be reimbursed to the District by DESE.

Davenport did complete a "Daily Visit Record" reflecting who she visited on September 19, 2007. This record reflected that on September 19, Davenport visited one other person and also stated, "I went to jail today, I did not pass go—I did not collect $200."

In October 2008, Davenport was subpoenaed to testify in an adoption hearing for C.B. Although Davenport informed Appellant of this fact, Appellant did not inform the superintendent or anyone else.

On March 12, 2009, at a meeting with Dr. Blaine Henningsen ("Henningsen"), the District's Superintendent of Schools, Appellant informed Henningsen, for the first time, of a possible situation with Bail and C.B. On April 15, 2009, Henningsen requested another meeting with Davenport to further discuss the situation and requested she bring the case file with her. Although uninvited, Appellant appeared with the case file a few minutes after the meeting started and remained until its conclusion. Henningsen asked Davenport why she went to the jail and "her immediate response, without blinking was: 'To get [Bail]—to get [Bail] to put [C.B.] up for adoption.'" Henningsen requested Appellant and Davenport separately "write down in chronological order everything that they remembered about the circumstances surrounding the situation."

On April 20, 2009, Appellant and Davenport provided Henningsen with written statements; they admitted they had spoken to each other prior to writing out their respective statements. In their written statements, Davenport and Appellant recalled that the primary reason Davenport went to the jail was to take a birth certificate application form to Bail.

On April 21, 2009, Appellant was "placed on administrative leave, with pay, pending completion of an investigation into allegations of improper behavior by a [PAT] educator in an incident that occurred under [her] supervision ..." On June 16, 2009, Henningsen issued to Appellant a "Statement of Charges" ("Charges"), pursuant to section 168.116. The Charges asserted that Appellant engaged in immoral conduct relating to her participation in an adoption of an incarcerated woman's child.[7]

---

**6.** Appellant testified she authorized one-half of Davenport's mileage to the jail but Davenport was actually reimbursed for 60% of her mileage.

**7.** Specifically, the Charges alleged as follows:

 I. IMMORAL CONDUCT IN THAT [APPELLANT] AUTHORIZED [DAVENPORT'S] SOLICITATION OF ADOPTION OF A MINOR CHILD.

 A. [Appellant] authorized [Davenport] to travel to a jail in Osceola, Missouri, on September 19, 2007, to visit [Bail] a former participant in the [PAT] Program. This visit was for an improper purpose and related to the adoption of [C.B.].

On August 13, 2009, a Board public hearing ("hearing") was held, pursuant to section 168.118, to consider the charges preferred against Appellant. All objections made by counsel were noted for the record, and all proffered evidence was admitted by the Board and was to be given its appropriate weight upon deliberation. Appellant and District presented evidence and testimony. Appellant, Davenport, Henningsen, and Jennifer Velazco–Hernandez [8] testified.

### Appellant's Testimony

Appellant testified that Davenport requested permission to go to the jail to visit Bail for the purpose of delivering a birth certificate application. Appellant did not suggest Davenport consider mailing the birth certificate application, and admitted that it "possibly" would have been prudent to try mailing it before sending a District employee there for half a day and spending District funds. Appellant admitted this circumstance was "very unusual," and that she knew the jail was outside of the District's county and C.B. would not be at the jail when Davenport made the visit.

Appellant also admitted she knew the DESE/ECDA guidelines regarding PAT personal visits and that the goal was the child should be present, but did not notify her supervisor or call DESE to get approval before this visit. Appellant also testified that for a visit to be classified as a "personal visit," the parent educator must take developmental materials with her on the visit. Appellant conceded it was her "mistake" to send Davenport without developmental information. As a result, Appellant testified that she did not consider Davenport's visit to be a "personal visit,"

B. [Appellant] authorized this visit with the knowledge that [Davenport] had helped arrange the transfer of custody of [C.B.] to another family without court or parental approval.

C. Although this visit could not properly be documented as a [PAT] visit, as [C.B.] was not present during the visit, [Appellant] approved one-half of [Davenport's] mileage to the jail (which is located two hours away from the District), utilizing [PAT's] funds for an improper purpose. [Appellant] also authorized payment to [Davenport] for ten (10) hours of work on September 19, 2007, which included the time in which she visited the jail.

D. [Appellant's] knowledge that [Davenport's] visit to the jail was for an improper purpose is demonstrated by the fact that [Appellant] approved only one-half of the mileage for the trip.

E. [Appellant] authorized the reimbursement of mileage even though [Davenport] confirmed that in her visit to the jail[,] she had solicited [Bail] to place [C.B.] with another family for adoption. [Appellant] did not report [Davenport's] inappropriate action to District administration or reprimand [Davenport] for this solicitation. To the contrary, [Appellant] rewarded this action by approving [Davenport's] mileage for this trip and paying [Davenport] for her time at the jail, even after confirmation of the trip's improper purpose.

F. When [Davenport] was subpoenaed to testify in an adoption proceeding for [Bail's] [child], [Davenport] informed [Appellant] that she had been subpoenaed. [Appellant] instructed [Davenport] that it was not necessary to inform District administration of the subpoena.

G. [Appellant] authorized [Davenport] to go outside the scope of the proper role of a [PAT] educator and aided in the solicitation of adoption of [C.B.].

H. [Appellant], despite knowledge of [C.B.] being subjected to conditions which would reasonably result in neglect, did not report the neglect to the Missouri Division of Social Services as required under Missouri law for mandatory reporters of suspected child abuse and neglect.

8. Jennifer Velazco–Hernandez was an ordained minister in her church and is the person whom Bail's family members retained to baby-sit C.B. while Bail was incarcerated. Velazco–Hernandez ultimately delivered C.B. to the persons who were interested in adopting C.B., and who ultimately did adopt C.B.

but merely "family support" and thus, no record regarding the visit was required to be completed and submitted to DESE. Appellant testified it was also a "mistake" not to have Davenport make a report of her visit. Appellant testified it was her decision to pay Davenport mileage for the trip to the jail. Appellant conceded at the hearing that about $181 of District funds were expended for Davenport's trip to the jail.

Appellant was not "shocked" that Davenport discussed adoption with Bail, and further testified it was okay with her if her parent educators talked to clients about giving their children up for adoption. Appellant testified she thought Davenport's daily record entry from her jail visit referencing she went to jail and did not collect $200 was "rather clever."

Appellant acknowledged an undocumented immigrant in a foreign prison, facing deportation to Guatemala, and separated from her newly born baby, would perhaps be vulnerable. Appellant admitted she failed to report in the March 12, 2009 meeting, in the April 15, 2009 meeting, and in her written statement that after returning from the jail, Davenport said she discussed adoption with Bail.

Appellant acknowledged she is a mandatory reporter of suspected child abuse and neglect under Missouri law.

### Henningsen's Testimony

Henningsen testified that after acquiring more information regarding the situation with the Bail family, he became concerned district PAT employees had been involved and were implicated in the adoption of a minor child.

Henningsen testified he asked Davenport, in their meeting on April 15, 2009, why she went to the jail to visit Bail on September 19, 2007, and Davenport's immediate response was: "To get [Bail]—to get [Bail] to put [C.B.] up for adoption." Upon hearing this statement from Davenport, Henningsen testified Appellant did not correct Davenport, did not act surprised at this statement, and did not act like she did not know this was the reason for the trip to the jail. Henningsen testified he was concerned Appellant did not make a response or correct Davenport, and Appellant's lack of response indicated to him Appellant was aware Davenport went to the jail to talk about adoption. Henningsen also testified Davenport said "this was the worst case of neglect that she had ever seen."

Henningsen explained Davenport changed her reason for going to the jail when she gave her written statement four or five days later from what she had stated in prior meetings. In Henningsen's deposition, he stated it was not until after "working through the situation and [they] had met a couple of times," that Davenport and Appellant remembered and indicated the original purpose for going to the jail was to try to get Bail to sign some papers to get a birth certificate for C.B.

Henningsen explained his basis for believing the accuracy of the charges against Appellant included the fact Davenport was not getting full reimbursement for her mileage and his inability to reconcile this with "why would someone who is on a legitimate visit to a parent, why would— why would they not get full reimbursement for the trip?" Henningsen testified after conducting some investigation, he confirmed " 'family support' means refer and recommend services, not what we were doing here."

### Davenport's Testimony

Davenport testified her purpose for going to the jail was to take an application for a birth certificate to Bail, and she had

asked Appellant for permission to go based on this purpose. Davenport testified C.B., at eleven months old, did not have a birth certificate and, therefore, could not receive immunizations and Women, Infants and Children ("WIC") benefits. When testifying whether she discussed adoption with Bail, Davenport stated, "I mentioned adoption to her or the possibility of adoption to her." "It was just presented lightly as a: 'Well, you know, you don't know how long you're going to be here in jail. You have—you don't know what your future holds. Have you ever thought about the selfless act of adoption?'"

Davenport testified after Henningsen requested written statements, she and Appellant "realized practically simultaneously . . . that we had—I had gone because of the—the papers for the application for the birth certificate." Davenport admitted the written statement she provided Henningsen regarding her trip to the jail was different than what she had told him at the April 15, 2009 meeting.

When questioned regarding whether she shared information about the living conditions of C.B. with Appellant, Davenport testified, "Possibly . . . I probably did." She admitted neither Appellant nor Davenport ever hotlined the neglect of C.B.

### Additional Evidence After the Hearing

Following termination of the hearing, but before the Board met to deliberate, District submitted a "Motion to Reopen Evidence" requesting the matter be reopened to consider additional evidence.[9] Appellant's counsel filed a response objecting to the District's motion. The motion was granted.

The additional evidence included a translated transcript ("transcript") of the audio recorded conversation between Davenport and Bail at the jail on September 19, 2007, as maintained by the St. Clair County Sheriff's Department. The recorded conversation between Davenport and Bail was in Spanish, and was translated by Dr. Gerald Edwards ("Edwards") into English. The transcript was supported by Edward's affidavit attesting to his qualifications and that the translation was a "true and accurate translation of the conversation captured on the audio recording."

The translation depicts a conversation in which Davenport repeatedly pressured Bail for nearly an hour to give C.B. up for adoption. Davenport presses adoption over Bail's repeated protests. Bail at one point states: "I feel tortured because I don't have [C.B.]." To this, Davenport retorts, "You don't really care about him that much." Davenport pressured Bail to let another family adopt C.B. stating, "They are a complete family. . . . They will be able to take care of him much better tha[n] you will be able to." At no time during this conversation did Davenport discuss with Bail the birth certificate application for C.B.

On August 31, 2009, the District rendered its "Findings of Fact, Conclusions of Law, and Decision," stating: "As there is substantial and competent evidence to support the Statement of Charges preferred against [Appellant], it is the decision of the [Board] that [Appellant's] employment with the [District] should be terminated." The Board unanimously voted to terminate

9. In its motion, the District noted it had attempted contact with the St. Clair County Sheriff's Department prior to the hearing in an attempt to retrieve the audio recorded conversation between Bail and Davenport at the jail on September 19, 2007; however, due to delay and technical difficulties occurring within the sheriff's department, the audio recording in the form of a compact disc was not released to the District until after the hearing.

Appellant's employment for immoral conduct.

The Board found the testimony of Henningsen to be credible. The Board determined that given Appellant's "cover up of the meeting at the [jail] by not requiring [Davenport] to fill out a mandatory report and her intentional failure to give [Davenport] developmental materials [to] take to the jail which resulted in no District or DESE documentation of this visit, [Appellant] is entitled to minimal credibility." The Board further concluded the significant discrepancies in Davenport's sworn testimony and the translation of the audio recording of her conversation with Bail at the jail, removed any credibility given to Davenport.

On September 10, 2009, Appellant filed a "Petition for Review Under Chapter 536 RSMo." in the Circuit Court of Jasper County. On March 4, 2010, following a hearing, the trial court issued its "Judgment" affirming the decision of the Board. This appeal followed.

## Issues on Appeal

Appellant alleges five errors by the Board in admitting the transcript into evidence and basing its decision on the transcript: (1) there was no foundation for admitting the transcript; (2) the transcript was not the best evidence of the purported jail conversation and also inadmissible; (3) the transcript was hearsay and inadmissible; (4) the affidavit of Edwards was inadmissible hearsay making the accompanying transcript inadmissible; and (5) Appellant was not timely served with the affidavit of Edwards. Appellant's final two points claim the Board erred in terminating Appellant's employment for "immoral conduct" because: (1) the decision was not supported by competent and substantial evidence upon the whole record; and (2) Appellant's conduct does not constitute immoral conduct as a matter of law. Respondent argues the transcript from the jail was admissible, and even if its admission was error, it was harmless. Respondent also contends the Board's decision was supported by competent and substantial evidence and Appellant's conduct constituted immoral conduct as a matter of law.

The issues pertinent to our resolution of this matter are:

1. Did Appellant's conduct constitute immoral conduct?
2. Did substantial and competent evidence support the Board's decision, notwithstanding the transcript?
3. Did the admission of the transcript constitute reversible error?

## Standard of Review

■ We review the findings of fact and decision of the Board, not the judgment of the trial court. *Gerig v. Bd. of Educ. of Cent. Sch. Dist., R–III*, 841 S.W.2d 731, 733 (Mo.App. E.D.1992). Our review is limited to a determination of whether the decision is supported by substantial and competent evidence upon the whole record, whether it is arbitrary, capricious or unreasonable, and whether the Board abused its discretion. § 536.140.2; *Keesee v. Meadow Heights R–II Sch. Dist.*, 865 S.W.2d 818, 823 (Mo.App. S.D.1993).

■ " 'This Court must look to the whole record in reviewing the Board's decision, not merely at that evidence that supports its decision, and we no longer view the evidence in the light most favorable to the agency's decision.' " *Stacy v. Harris*, 321 S.W.3d 388, 393 (Mo.App. S.D. 2010) (quoting *Missouri Veterans Comm'n v. Vanderhook*, 290 S.W.3d 115, 119 (Mo. App. W.D.2009)) (internal quotation omitted). However, this Court may not substitute its judgment on the evidence for that

of the agency, and must defer to the agency's determinations on the weight of the evidence and the credibility of witnesses. *Stacy,* 321 S.W.3d at 393–94. "'While this Court cannot substitute its own judgment on factual matters, it can independently determine questions of law.'" *Id.* at 394 (quoting *Orion Sec., Inc. v. Bd. of Police Comm'rs of Kansas City,* 90 S.W.3d 157, 163 (Mo.App. W.D.2002)).

■ "There is a strong presumption of validity in favor of Board's decision, and that decision cannot be reversed simply because we might have reached a different initial conclusion." *Gerig,* 841 S.W.2d at 733. This strong presumption can only be overcome by a clear and convincing showing the Board's decision was arbitrary, capricious, unreasonable or an abuse of discretion. *Id.* "'If the Board's ruling is supported by competent and substantial evidence upon the whole record the ruling will be affirmed, even though the evidence would also have supported a contrary determination.'" *Stacy,* 321 S.W.3d at 393 (quoting *Vanderhook,* 290 S.W.3d at 119–20) (internal quotation omitted).

### *Appellant's Conduct Constituted Immoral Conduct*

Because we believe clarification of "immoral conduct" under section 168.114 aids in understanding our analysis of each of Appellant's points, we choose to address Appellant's final two points on appeal first. Appellant contends her actions do not constitute "immoral conduct" as a matter of law, and there was no evidence the alleged misconduct would have an adverse effect on students or teachers. We disagree.

■ Section 168.114 enumerates six grounds upon which an indefinite contract with a permanent teacher may be terminated. These provisions are designed to serve and protect the communities in which teachers are employed and enable

school districts to terminate teachers' contracts for conduct that endangers the welfare of students. *Hamm v. Poplar Bluff R–1 Sch. Dist.,* 955 S.W.2d 27, 29 (Mo.App. S.D.1997). "'The paramount interest is the welfare of the students, and the authority of the Board should not be confined to such an extent that there may be no remedy for a situation having serious negative potential.'" *Id.* at 29–30. (quoting *C.F.S. v. Mahan,* 934 S.W.2d 615, 617 (Mo. App. E.D.1996)).

■ "Immoral conduct" is one of the limited causes for termination under section 168.114. "Immoral conduct" means conduct which renders a teacher unfit for the performance of her duties. *Ross v. Robb,* 662 S.W.2d 257, 259 (Mo. banc 1983). However, "[t]hat the conduct renders the teacher unfit to teach is a limitation, not a definition of immoral conduct." *In re Thomas,* 926 S.W.2d 163, 165 (Mo.App. E.D.1996). "Immoral conduct" contemplates behavior "sufficiently contrary to justice, honesty, modesty or good morals, or involving baseness, vileness or depravity so as to support the inference that the teacher consciously comprehended the wrongful nature of the conduct." *Youngman v. Doerhoff,* 890 S.W.2d 330, 341 (Mo.App. E.D.1994).

The Eastern District explained

immoral conduct is conduct which goes beyond a matter of judgment such that the teacher may properly be presumed to have prior notice of its wrongful character and thus may be properly held responsible for his conscious disregard of established moral standards. Immoral conduct is conduct which is always wrong. Just as one can never be accidentally or unwittingly dishonest, immoral conduct requires at least an inference of conscious intent. To hold otherwise would vitiate the legislature's

intent to provide stability and certainty in matters of teacher discipline and seriously undermine if not destroy the concept of prior notice that due process requires in teacher termination cases. *Youngman,* 890 S.W.2d at 342.

 If conduct is found to be immoral, it must then be determined if such conduct renders the teacher unfit to teach. *In re Thomas,* 926 S.W.2d at 165.

Although the facts of this case are unique, the following cases are instructive in applying these facts to the law because they address similarly characterized conduct. In *Kimble v. Worth County R–III Bd. of Educ.,* 669 S.W.2d 949, 952 (Mo. App. W.D.1984), a teacher-librarian's conduct involving theft of school property was held to constitute immoral conduct. The trial court held:

> The taking of property belonging to another without consent, notwithstanding its return when confronted with such wrongdoing, breaches even the most relaxed standards of acceptable human behavior, particularly so with regard to those who occupy positions which bring them in close, daily contact with young persons of an impressionable age.

*Id.* at 953. Additionally, in *Cochran v. Bd. of Educ. of Mexico Sch. Dist. No. 59,* 815 S.W.2d 55, 58 (Mo.App. E.D.1991), the school board concluded a teacher's conduct was immoral for misappropriating school funds; his conduct included falsifying records of school district property and failure to comply with the program's requirements. *Id.* at 63. Missouri courts have made it clear that "immoral conduct under [section 168.114] is not limited solely to sexual conduct. It includes other conduct such as theft of school property." *Id.*

 Appellant's conduct can similarly be characterized as immoral conduct as it goes beyond poor judgment and falls outside the scope of acceptable behavior. In finding Appellant's conduct immoral, we specifically recognize Appellant's authorization of Davenport to visit the jail for an improper purpose, the mishandling of school funds under the PAT program, and the silence involved in covering up the true purpose of Davenport's trip to the jail.

Appellant argues her actions did not have the requisite intent to constitute immoral conduct. We are not persuaded. Specifically, Appellant's actions in concealing Davenport's purpose for visiting the jail—only approving half the mileage, not sending developmental material, not asking DESE for approval, not requiring a report of Davenport's visit, and not informing District administration of the subpoena served upon Davenport—demonstrates she knew that visiting an incarcerated immigrant, facing deportation, to solicit the adoption of her child, was unacceptable under the PAT program. It shows Appellant willfully participated in conduct she knew to be unacceptable under the PAT program, and it satisfies the intentional element of immoral conduct.

Moreover, Appellant's actions in ensuring there was no documentation of the visit demonstrated continued deceit by Appellant. Although Appellant characterizes each separate incident as a "mistake," cumulatively, they support the fact that Appellant knew Davenport's conduct as a PAT educator was wrong, and utilizing District funds for such purpose was also wrong. Strict recordkeeping and reimbursement requirements help to ensure PAT educators are acting in line with the PAT program guidelines and goals. Appellant admitted to knowing these requirements. However, meeting with Bail to pressure her into adoption does not fall under any of PAT's "Description of Services." Appellant's actions reflect deceit and dishonesty.

Not only did Appellant maintain silence in covering up the incident, but she also mishandled District funds as the activity she authorized was not reimbursed because it did not comply with DESE/ECDA requirements. Appellant admitted she was aware of the requirements for DESE reimbursement for such a visit, but still failed to comply to ensure the District was reimbursed. Although Appellant noted that about $181 District dollars were expended for Davenport's trip to the jail, we observe it is not the amount of money improperly spent that raises concern, it is the act of using taxpayer funds for an improper purpose that is at issue.

PAT is a state-funded program designed to help increase parent confidence and improve parenting skills. Davenport's conduct at the jail and Appellant's approval of this behavior, is completely contrary to the spirit and purpose of PAT, and we decline to restrict the Board's authority to act in such a situation carrying serious negative repercussions. Again, we emphasize the Board's decision to terminate Appellant's employment for her immoral conduct must be considered in context of all the extenuating circumstances—vulnerable parent, misuse of funds, cover-up, failure to take responsibility, and the potential for disastrous consequences.[10] Appellant's conduct, as director of the PAT program, violated the very purpose of the program and broke the trust between the PAT program and the community. Appellant admitted Bail was perhaps in an extremely vulnerable situation—Appellant knew that Bail was incarcerated, did not speak English, was undocumented, and facing deportation. Pressuring an extremely vulnerable parent to give her child up for adoption carries with it grave consequences for those involved.

To condone the Appellant's conduct in this case would frustrate the protections to which these children and parents are entitled. We hold that, given the facts of the present case, and for purposes of § 168.071.1, Appellant's actions and inactions constituted immoral conduct.

■■■■ Appellant also contends no evidence existed that Appellant's conduct, even if it were immoral, rendered her unfit to teach. We find the Board's determination that such conduct rendered Appellant unfit to teach properly applied the law and is sufficiently supported by the record.

■■■■ Evidence of, or a specific separate finding of "unfitness to teach," is not required, but there must be some nexus between the immoral conduct shown in the evidence and fitness to teach. *Cochran,* 815 S.W.2d at 64. Factors for this determination include

(1) the age and maturity of the teacher's students; (2) the likelihood that the teacher's conduct will have an adverse effect on students or other teachers; (3) degree of anticipated adversity; (4) proximity of the conduct; (5) extenuating or aggravating circumstances surrounding the conduct; (6) likelihood that the conduct would be repeated; (7) underlying motives; and (8) the chilling effect on the rights of teachers.

*In re Thomas,* 926 S.W.2d at 165–66.

Here, the facts support Appellant's unfitness to teach. In part, the Board focused on the likelihood the conduct would be repeated. The Board cited Appellant's casual attitude, which was supported by Appellant's testimony that it was okay for

---

10. We note that a supervisor's awareness of an isolated incident of a PAT educator discussing adoption with a PAT client may not always constitute immoral conduct; it is the presence of the extenuating circumstances, which in and of themselves reflect immoral conduct, that make this conduct rise to the level of immoral conduct.

PAT educators to talk to clients about adoption, that is was not a mistake for Davenport to go to the jail, and the fact that Appellant concealed her actions and Davenport's actions by failing to keep a proper record. We find the Board's conclusion that Appellant's conduct would likely be repeated was logical. Appellant's casual attitude that PAT educators may discuss adoption is indicative she may not act differently to protect vulnerable PAT clients in the future from individuals interested in promoting their own agenda while acting under the authority of PAT educators. The Board also noted Appellant's position as PAT director provides an opportunity to influence other families and children. Again, we agree the potential for negative consequences are high because of Appellant's influential role as director of PAT in often dealing with vulnerable parents and children.

Thus, the record shows the Board appropriately applied the facts to the law in finding Appellant's conduct also rendered her unfit to teach. Appellant's point seven is denied.

### Competent and Substantial Evidence Supported the Board's Decision

Next, we address Appellant's allegation the Board erred in terminating Appellant for immoral conduct because the decision is not supported by competent and substantial evidence upon the whole record. Specifically, Appellant alleges: (1) the Board's findings are inconsistent and contradictory; (2) expenditures of PAT funds for the purpose of helping to obtain a birth certificate to obtain public assistance is consistent with PAT goals; and (3) the lack of immunizations and public assistance is not abuse triggering mandatory reporting, and the record does not show when Davenport informed Appellant of the neglect. Keeping in mind the deference

accorded the Board's credibility findings, we conclude the whole record substantiates the Board's decision that Appellant engaged in immoral conduct relating to her participation in the pressuring of an incarcerated woman to give her biological son up for adoption. In this determination, we do not consider the evidence in Edward's affidavit or the transcript. *See infra.*

 "Substantial evidence is merely evidence which, if true, has probative force upon the issues, i.e., evidence favoring facts which are such that reasonable men may differ as to whether it establishes them." *Clark v. Bd. of Directors of Sch. Dist. of Kansas City*, 915 S.W.2d 766, 773 (Mo.App. W.D.1996). "An agency's decision is unsupported by competent and substantial evidence only in the rare case when the decision is contrary to the overwhelming weight of the evidence." *Miller v. Dunn*, 184 S.W.3d 122, 124 (Mo.App. E.D.2006).

 First, we address Appellant's allegation that the Board's findings are internally inconsistent in concluding both that Appellant knew the purpose of Davenport's visit before she left and that she only found out about the discussion after Davenport returned. Appellant incorrectly assumes the Board "accepted that [Appellant] first learned about the adoption discussion after the fact" because the Board found Appellant admitted to learning about the conversation after Davenport returned; that Appellant did not require Davenport to document the visit "even after" those questions arose; and that Davenport "received full pay even after [Appellant] learned" about the adoption discussion. These findings of fact, however, are not inconsistent with the Board's ultimate conclusion that Appellant knew Davenport intended to discuss adoption, and authorized her to do so. The fact

the Board found evidence *"confirmed"* Appellant knew of Davenport's purpose for the visit following her return, certainly is not inconsistent with the Board's conclusion that she knew beforehand.[11] These alleged inconsistencies are actually a reflection of the discrepancies in the accounts of Davenport and Appellant; Davenport originally stated the reason for the visit was to solicit the adoption of C.B., but later stated that the real reason was to take a birth certificate application form. If the evidence supports two contrary findings, we must defer to the Board's factual determinations. *Bickl v. Smith,* 23 S.W.3d 865, 867 (Mo.App. E.D.2000).

Appellant also argues the expenditure of PAT funds to secure Bail's signature on a birth certificate application form so C.B. could obtain public assistance is consistent with PAT program goals. Appellant's argument ignores the Board's finding that Davenport's purpose for visiting the jail was not to obtain Bail's signature on a birth certificate application form; rather, the Board found Davenport went to the jail for the purpose of soliciting the adoption of C.B. The Board explicitly found Appellant and Davenport not credible and discredited their testimony regarding Davenport's proffered reason for visiting the jail. The Board was free to believe all, part, or none of the witnesses' testimony. *See Hanford v. City of Arnold,* 49 S.W.3d 707, 710 (Mo.App. E.D.2001). Furthermore, substantial and competent evidence in the record reflects Appellant knew of the true purpose of Davenport's trip, authorized this visit despite knowledge of its

illicit purpose, paid for the trip with District funds, and then concealed the nature of the trip.[12] Henningsen, found by the Board to be credible, testified Davenport stated in the April 15 meeting that she went to the jail, "To get [Bail]—to get [Bail] to put [C.B.] up for adoption." It was not until after Appellant and Davenport conferred that they alleged the purpose of the trip was to deliver a birth certificate application form. This is further supported by Appellant's conduct, before and after, to conceal the purpose of the trip by preventing documentation of the visit.

Evidence also supporting Appellant's knowledge of Davenport's improper purpose for the trip and continually taking steps to prevent disclosure of the trip's purpose included the fact Appellant only approved one-half of the mileage for Davenport's trip; Appellant's failure to correct Davenport when she told Henningsen the purpose of the trip was to discuss adoption, indicating to Henningsen Appellant was aware of the situation; and Appellant's failure to require a written record of the trip by not providing Davenport with developmental materials, which would have required documentation of the trip's purpose. Appellant characterizes her failures as mere "mistakes." Appellant also testified this visit fell under "family support," but Henningsen testified that upon further investigation, he found this visit to the jail was not consistent with "family support" services under the PAT program. Appellant's explanations of her conduct are unconvincing and cumulatively they indicate

11. For example, the Board concluded, "The evidence supports the finding that [Appellant] authorized the reimbursement of [Davenport's] mileage to the jail even though [Davenport] *confirmed* that in her visit to the jail, she had solicited the incarcerated woman to place her child with another family for adoption." (Emphasis added).

12. Section 536.070(8) provides: "Any evidence received without objection which has probative value shall be considered by the agency along with the other evidence in the case."

she was acting to conceal the purpose of Davenport's visit to the jail.

Furthermore, upon return from her visit, Davenport confirmed she discussed adoption with Bail. Despite this, Appellant authorized reimbursement of approximately sixty percent of Davenport's mileage, and full pay. Additionally, Appellant did not reprimand Davenport or report her actions to the District administrator. In fact, Appellant testified at the hearing it was okay with her if PAT educators talked with clients about giving their children up for adoption and that she was not surprised or shocked Davenport discussed adoption. Furthermore, after Davenport was subpoenaed for C.B.'s adoption proceedings, Appellant instructed Davenport it was not necessary to inform District administration of the subpoena. Accordingly, Appellant's actions before and after Davenport's visit to the jail, support the Board's finding that Appellant was not only aware of Davenport's improper purpose for visiting the jail, but Appellant took measures to prevent it from being documented and expended District funds.

 Additionally, sufficient evidence supported the Board's finding that Appellant, as a mandated reporter, knew C.B. was being subjected to conditions which would reasonably result in neglect, but failed to report the neglect. Davenport admitted at the hearing that she probably shared information regarding the poor living conditions of C.B. with Appellant. As described by Davenport, C.B.'s living conditions were "the worst case of neglect" she had ever seen. Appellant also testified that she knew C.B. did not have a birth certificate and that this prohibited C.B. from having immunizations and receiving WIC benefits. Appellant admitted that an eleven-month-old infant without immunization and benefits is a serious problem.

Appellant conceded she did not hotline the neglect of C.B.

 Appellant, as the director of the PAT program, was responsible for supervising PAT employees. Appellant admitted to authorizing Davenport's visit to the jail and expending District funds, and evidence supports the purpose of the trip was to solicit Bail to give C.B. up for adoption and Appellant continued to cover up the purpose of the trip by preventing any documentation of the visit. "Quite simply, if evidence before an administrative agency has any probative force on an issue and can aid the agency in deciding the case, it constitutes substantial evidence, and under the standard of review, we must uphold the agency's decision." *Lagud v. Kansas City Mo. Bd. of Police Comm'rs,* 272 S.W.3d 285, 292 (Mo.App. W.D.2008). A review of the record reveals sufficient competent and substantial evidence supporting the Board's finding that Appellant engaged in immoral conduct related to her participation in the pressuring of an incarcerated woman to give her biological son up for adoption, notwithstanding the jail transcript. Therefore, Appellant's point six is denied.

### Admission of Transcript Not Reversible Error

Five of Appellant's points argue the Board "erred in admitting into evidence and basing its decision on a purported English transcript . . . because the transcript was not competent evidence." Because, as determined above, there is sufficient competent evidence to sustain the decision without considering the transcript, any error in admitting the transcript is harmless.

 Our supreme court has stated "although technical rules of evidence are not controlling in administrative hearings, fundamental rules of evidence are applicable." *State Bd. of Registration for Heal-*

*ing Arts v. McDonagh,* 123 S.W.3d 146, 154 (Mo. banc 2003). " '[S]tatements in violation of evidentiary rules do not qualify as competent and substantial evidence to support an agency's decision, when proper objection is made and preserved.' " *Dorman v. State Bd. of Registration for Healing Arts,* 62 S.W.3d 446, 454 (Mo.App. W.D.2001) (quoting *Concord Publ'g House, Inc. v. Dir. of Revenue,* 916 S.W.2d 186, 195 (Mo. banc 1996)) (internal quotation omitted). However, section 536.070(7) [13] of the Administrative Procedure Act requires an administrative tribunal to receive proffered evidence in the record regardless of any evidentiary objections. "Reception of hearsay or other inadmissible evidence does not dictate a reversal unless there is not sufficient competent evidence to sustain the decision." *Giessow v. Litz,* 558 S.W.2d 742, 750 (Mo.App. E.D.1977).

■ Here, Appellant specifically objected to the transcript because there was no opportunity to review it for accuracy, no appropriate foundation was demonstrated, the transcript was not authenticated, and Edward's affidavit—purporting to authenticate the transcript—was inadmissible hearsay. We acknowledge Edward's affidavit was inadmissible hearsay as it was not introduced pursuant to section 536.070(12),[14] and no other applicable hearsay admissibility exception is apparent; therefore, the affidavit was unable to authenticate the transcript and we cannot assume the authenticity of the transcript without some proof of what it purports to be.

Nevertheless, this finding does not dictate reversal because there is sufficient competent evidence to sustain the decision, notwithstanding the exclusion of the transcript as substantive evidence. *See Giessow,* 558 S.W.2d at 750. Appellant's points one through five alleging evidentiary errors are denied because substantial and competent evidence supports the Board's decision, even without the transcript.

Accordingly, the judgment is affirmed.

RAHMEYER, P.J., and BATES, J., concurs.

---

13. Section 536.070(7) provides:
Evidence to which an objection is sustained shall, at the request of the party seeking to introduce the same, or at the instance of the agency, nevertheless be heard and preserved in the record, together with any cross-examination with respect thereto and any rebuttal thereof, unless it is wholly irrelevant, repetitious, privileged, or unduly long.

14. We note section 536.070(12) provides a procedure for introducing an affidavit into evidence in a contested case. Here, because, as an initial matter, the copies of the affidavit were not served on all other parties as required by this subsection, they may not be used except in ways that would have been permissible in the absence of this subdivision.